Michael Wayne WILLIAMS, Petitioner–Appellant,

v.

John B. TAYLOR, Warden, Sussex I State Prison, Respondent–Appellee.

No. 99–1.

United States Court of Appeals, Fourth Circuit.

Argued: June 7, 1999

Decided: Aug. 2, 1999

**ARGUED:** Barbara Lynn Hartung, Richmond, Virginia, for Appellant. Donald Richard Curry, Senior Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, forAppellee. **ON BRIEF:** James E. Moore, Christian & Barton, L.L.P., Richmond, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellee.

Before WILKINSON, Chief Judge, and HAMILTON and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge HAMILTON and Judge WILLIAMS joined.

## OPINION

WILKINSON, Chief Judge:

Michael Wayne Williams was sentenced to death for the murders of Morris Keller, Jr., and his wife, Mary Keller. At trial, Williams admitted to robbing the Kellers, being an accomplice to the rape of Mrs. Keller, and shooting Mr. Keller. He now appeals the district court's denial of his petition for a writ of habeas corpus. We affirm the judgment of the district court.

### I.

Between 9:30 and 10:30 on the night of Saturday, February 27, 1993, Williams and Jeffrey Alan Cruse caught a ride with Verena Lozano James to a rural area in Cumberland County. Williams and Cruse intended to rob the nearby Bear Creek Market with a .357 caliber Ruger Black Hawk revolver that Williams had given to Cruse.

After finding the market closed, Williams informed Cruse that "he knew a house where we can go; they'd have a couple thousand dollars." The two men then proceeded to the home of Mr. and Mrs. Keller. Mr. Keller opened the door, Williams pointed the .357 at him, and both Williams and Cruse walked inside the house.

Williams and Cruse then escorted Mr. Keller to the Kellers' kitchen, where three men encountered Mrs. Keller. Williams demanded that the Kellers remove their clothing. Cruse then began to search the house for money and other valuables while Williams remained with the Kellers. Cruse located a fully-loaded .38 caliber handgun during his search.

When Cruse returned to the kitchen, Williams suggested they tie the Kellers up, and Cruse did so with some phone cord. Williams and Crusé then placed the Kellers in a living room closet and continued their search of the house.

Some time later Cruse moved Mrs. Keller, still naked, to another closet—this one in a back bedroom of the house. Both Williams and Cruse then raped Mrs. Keller. During the rape Mrs. Keller pleaded, "Just don't hurt us." After they had finished, Williams and Cruse retrieved Mr. Keller, and Williams instructed both Kellers to take showers and put on clean clothing. Williams then told the Kellers they were going to "take a walk." On the way out of the house Williams informed Mrs. Keller that he planned to burn the house. Upon Mrs. Keller's request, Williams accompanied her back inside to get the Kellers' marriage license.

With Williams carrying the .38 and Cruse the .357, the two men walked the Kellers down a dirt road and into a thicket. Williams then took up a position directly behind Mr. Keller and Cruse stood behind Mrs. Keller. Williams said, "We'll shoot at the count of three." At the count of three, Williams shot Mr. Keller, who fell to the ground. Cruse did not fire. Williams turned to Cruse and told him to shoot. After Cruse shot and Mrs. Keller fell, Mr. Keller stood up again. Williams then shot him a second time. As Cruse began to walk away, Williams said, "Wait.... What if they ain't dead?" Williams then approached the Kellers and shot each a few more times.

Williams and Cruse next returned to the house, where they loaded the Kellers' Jeep Cherokee with their television set, microwave oven, stereo and speakers, and shotgun. After loading the Cherokee, the two men set fire to the house.

The next day Williams and Cruse sold some of the property they had taken from the Kellers. They then threw the remaining property and the .357 into the Rappa-hannock River and set fire to the Chero-kee.

When James heard about the fire at the Kellers' house, she contacted the police and informed them that she had deposited Williams and Cruse near the house on the night of the fire. The police interviewed Cruse, who was unresponsive until the police located the bodies of Mr. and Mrs. Keller.

After consulting counsel, Cruse agreed to a plea bargain pursuant to which he would disclose his knowledge of the crimes in exchange for a promise from the Commonwealth not to seek the death penalty. Cruse then gave a statement in which he explained the events of the fateful night in detail, with the exception of Cruse's own participation in the rape of Mrs. Keller. Upon learning of Cruse's falsehood, the Commonwealth revoked its plea agreement with Cruse and later indicted him for capital murder.

Williams was indicted for the capital murder, robbery, rape, and abduction of Mrs. Keller; for the capital murder, robbery, and abduction of Mr. Keller; for capital murder based on two related homicides; statutory burglary; and arson. At trial in January 1994, Williams took the stand in his own defense. He confirmed significant parts of the Commonwealth's case. In particular, he indicated that he was the one who suggested robbing the Bear Creek Market, that it was his suggestion to set fire to the Kellers' house, and that he shot Mr. Keller in the head. He contradicted portions of the evidence presented against him, most of which was in the form of testimony by Cruse. Specifically, he denied that he also raped Mrs. Keller, that he fired any shots other than the first one, and that he was the instigator at various other points during the commission of the crimes.

The jury convicted Williams of capital murder. It then recommended the death sentence on the basis of Williams' future dangerousness and the vileness of his crimes. The trial court agreed with the

jury's recommendation and sentenced Williams to death. The Supreme Court of Virginia affirmed the conviction and sentence, *Williams v. Commonwealth,* 248 Va. 528, 450 S.E.2d 365 (Va.1994), and the United States Supreme Court denied certiorari, *Williams v. Virginia,* 515 U.S. 1161, 115 S.Ct. 2616, 132 L.Ed.2d 858 (1995).

Williams then filed a petition for state habeas and moved for discovery, an evidentiary hearing, and expert assistance. The Supreme Court of Virginia denied these motions and the petition, stating without explanation that Williams' claims were meritless. The United States Supreme Court again denied certiorari. *Williams v. Netherland,* 519 U.S. 877, 117 S.Ct. 200, 136 L.Ed.2d 136 (1996).

Next, Williams filed a petition for habeas corpus in the United States District Court for the Eastern District of Virginia. The district court granted Williams an evidentiary hearing on three of his claims and dismissed the rest. Because Williams filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, this court entered a stay and instructed the district court to reconsider its grant of an evidentiary hearing in light of 28 U.S.C. § 2254(e) as amended by that Act. After applying the AEDPA, the district court denied Williams' request for an evidentiary hearing and dismissed his petition in its entirety. Williams now appeals.

## II.

Williams maintains he was entitled to an evidentiary hearing in the district court to establish several claims. Two of those claims arise under the Sixth Amendment. First, Williams claims that one of the jurors failed to answer honestly questions put to her on voir dire. *See United States v. Bynum,* 634 F.2d 768 (4th Cir.1980). Specifically, Williams contends that juror Bonnie Stinnett failed to disclose that she had once been married to Deputy Sheriff Claude Meinhard—who would testify for the Commonwealth—when Stinnett was asked whether she was related to any witness in the case. Williams also maintains that Stinnett withheld the fact that prosecutor Robert Woodson had represented her in her divorce proceedings. Second, Williams claims that the prosecutor improperly failed to correct the dishonest juror. Williams argues that Woodson failed to disclose both of these pieces of information and thereby violated his right to a fair trial. *See United States v. Kojayan,* 8 F.3d 1315 (9th Cir.1993).

With respect to his other claim, Williams maintains that the Commonwealth failed to provide him with exculpatory evidence as required under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In particular, Williams claims that the Commonwealth failed to disclose a psychiatric evaluation that indicated Cruse had little specific recollection of the events surrounding the Keller murders.

## A.

The district court denied Williams an evidentiary hearing on these claims. Section 2254(e)(2) provides:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

 (A) the claim relies on—

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable

factfinder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2). The district court held that whatever else Williams could show, he could not demonstrate actual innocence as required by section 2254(e)(2)(B).

Williams argues that the district court erred in applying section 2254(e)(2) to his request at all. He maintains that section 2254(e)(2) applies only when the petitioner "has *failed* to develop the factual basis of a claim in State court." *Id.* (emphasis added); *see also Cardwell v. Greene,* 152 F.3d 331, 337 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998). According to Williams, he did not "fail" to develop the factual foundation for any of these claims in state court. Williams argues that he had no way of knowing the specific facts underlying his claims. This is especially true, Williams maintains, because the Supreme Court of Virginia denied his requests for discovery, a hearing, and expert and investigative assistance. Williams contends, therefore, that section 2254(e)(2) should not apply to his request for a hearing in district court.

 We disagree. To escape the requirements of section 2254(e)(2), a petitioner must "diligently... develop the factual basis of" his claim in state court. *Cardwell,* 152 F.3d at 337; *see also Wright v. Angelone,* 151 F.3d 151, 164 (4th Cir.1998) (in order to obtain evidentiary hearing petitioner must show "why the factual predicate for this claim could not have been discovered earlier"). Ignorance in and of itself is not sufficient to show diligence; that ignorance must be reasonable. *See Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (to be excused, legal basis of a claim must not be reasonably available). Nor may a petitioner's requests for investigative assistance, hearings, and discovery on state habeas be vague and conclusory. Rather, a petitioner must tie his requests to his specific claims and state with some particularity the need for assistance. To hold otherwise would permit criminal defendants to avoid the strictures of section 2254(e)(2) simply by churning out unsupported, boiler plate requests for state court discovery, hearings, and investigative and expert assistance.

 Williams clearly has not "diligently sought to develop the factual basis of" his claims for federal habeas relief. *Cardwell,* 152 F.3d at 337. The documents supporting Williams' Sixth Amendment claims have been a matter of public record since Stinnett's divorce became final in 1979. Indeed, because Williams' federal habeas counsel located those documents, there is little reason to think that his state habeas counsel could not have done so as well. Williams' request for investigative assistance was also deficient. He alluded vaguely to "irregularities, improprieties and omissions" with regard to jury selection and asked for an investigator to examine "all circumstances relating to the empanelment of the jury and the jury's consideration of the case." This request in no way alerted the state habeas court to any specific claim. *See Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) ("[I]t would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." (internal quotation marks omitted)). The failure to develop the Sixth Amendment claims was thus attributable to petitioner, not to the Supreme Court of Virginia's rejection of a fishing expedition request.

The same is true of Cruse's psychiatric evaluation. In support of his claim that the Commonwealth suppressed the evaluation, Williams provides nothing more than an affidavit from his state habeas counsel attesting to "no recollection of seeing this report in Mr. Cruse's court file." In light of the fact that Williams' federal habeas counsel located the evaluation in this very file, state habeas counsel's failure to see

the report is insufficient to demonstrate diligence. Indeed, that failure tends to show that counsel did *not* act diligently.

Thus, it is clear that section 2254(e)(2) applies to Williams' request for a hearing. It is equally clear that Williams is ineligible for a hearing in federal court under this section. To be eligible, Williams must be able to demonstrate both due diligence and that "but for [the alleged] constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(A)(ii)-(B).

The discussion above makes plain that Williams was not duly diligent. Nor can Williams show that no reasonable factfinder would have found him guilty of capital murder. At trial Williams himself testified that he robbed the Kellers at gunpoint, was at least an accomplice to the rape of Mrs. Keller, and was the first person to shoot Mr. Keller in the head. The Commonwealth's Assistant Chief Medical Examiner, who performed the autopsy on Mr. Keller, testified that each gunshot wound suffered by Mr. Keller contributed to his death. Moreover, although Williams denied that he raped Mrs. Keller, tests on seminal fluid retrieved from her body revealed that some of the fluid could be attributed only to Williams.

Under Virginia law, this evidence was more than sufficient to convict him of capital murder. *See Strickler v. Commonwealth,* 404 S.E.2d 227, 235 (Va.1991) ("We adhere to the view that where two or more persons take a direct part in inflicting fatal injuries, each joint participant is an 'immediate perpetrator' for the purposes of the capital murder statutes."); *Briley v. Commonwealth,* 221 Va. 563, 273 S.E.2d 57, 63 (Va.1980) (holding that it is only necessary to prove that defendant was immediate perpetrator in the murder and accomplice in the rape to convict of capital murder). In sum, it is not surprising that the district court found that based "on this evidence alone, Williams cannot demonstrate by 'clear and convincing evidence' that no reasonable juror would have found him guilty

of the capital murder of Mr. Keller," that "Williams cannot make the requisite showing of 'innocence' under 28 U.S.C. § 2254(e)(2)," and that "he is not entitled to an evidentiary hearing on his remaining claims."

### B.

■ Even were section 2254 not to apply, Williams would be unable to show his eligibility for a hearing under pre-AEDPA law. *See Cardwell,* 152 F.3d at 337 ("If, on the other hand, the applicant has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under [pre-AEDPA law].""). Williams can show neither cause for nor prejudice from his failure to raise the aforementioned Sixth Amendment and *Brady* claims in state court. *See Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

■ To demonstrate cause, Williams must establish that " 'some objective factor external to the defense impeded counsel's efforts.' " *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). As noted, Williams' failure to develop the facts in state court was due to his own lack of diligence. Williams neither brought forth reasonably available facts, nor made reasonable efforts to convince the Supreme Court of Virginia that additional discovery was warranted.

■ Williams is also unable to demonstrate prejudice. In order to do so, he must show that, absent the alleged constitutional violation, the outcome of the case likely would have been different. *See Carrier,* 477 U.S. at 494, 106 S.Ct. 2639. As we have indicated, Williams' trial testimony alone was enough to convict him. *See Fitzgerald v. Greene,* 150 F.3d 357, 366 (4th Cir.) (finding no actual prejudice based on overwhelming evidence of guilt, future dangerousness, and vileness of

crime), *cert. denied,* —— U.S. ——, 119 S.Ct. 389, 142 L.Ed.2d 321 (1998). Moreover, Williams' claims with respect to juror Stinnett were marginal. It is hardly clear that Stinnett was related to Deputy Sheriff Meinhard given that the two divorced some fifteen years before Williams' trial. Furthermore, Meinhard's testimony was brief and did not speak to the critical facts of the trial. In fact, Williams' trial attorneys saw no need to cross-examine him. And the prosecutor explained his failure to notify the court of the relationship in an affidavit in which he stated that he simply did not remember being involved in Stinnett's divorce—a plausible claim given that the divorce occurred fifteen years prior to Williams' trial and was uncontested. Finally, it is anything but clear that a divorce from one of the Commonwealth's witnesses would predispose a juror toward the Commonwealth's case.

For all of these reasons, the district court properly denied Williams' request for an evidentiary hearing.

## III.

■ Williams next challenges the district court's dismissal of two claims on which the Supreme Court of Virginia found against Williams on the merits. We review decisions by state courts on the merits of a claim under section 2254(d). Section 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under normal circumstances, section 2254(d)(1) prohibits the issuance of the writ unless the state court decision conflicts squarely with Supreme Court precedent which is controlling as to law and fact, or if no such precedent exists, if "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." *Green v. French,* 143 F.3d 865, 870 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999). Where, as here, "the state court decision fails to articulate any rationale for its adverse determination... [we] must independently ascertain whether the record reveals a violation of [petitioner's constitutional rights.]" *Cardwell,* 152 F.3d at 339. Nonetheless an overall obligation of deference to the state court system still obtains, and a state court's perfunctory decision both constitutes an adjudication on the merits, *see Wright v. Angelone,* 151 F.3d 151, 156–57 (4th Cir.1998), and must be upheld if it "is at least minimally consistent with the facts and circumstances of the case." *Weeks v. Angelone,* 176 F.3d 249, 259 (4th Cir.1999) (internal quotation marks omitted). Here that standard of minimal consistency was more than met.

## A.

■ Williams first claims that the prosecution suppressed an alleged informal plea agreement that the Commonwealth had with Cruse in violation of *Brady.* The Supreme Court of Virginia was correct, however, to reject Williams' claim. In state court the Commonwealth supplied two affidavits—one from Woodson and one from Cruse's trial counsel, Donald Blessing—stating unequivocally that Cruse had no agreement. Specifically, Woodson swore, "At the time Cruse testified against

Williams in January of 1994, he had no plea agreement. Cruse testified truthfully that there was no plea agreement and that he remained charged with capital murder and subject to the death penalty." Similarly, Blessing stated, "Cruse testified truthfully at... trial that he had no plea agreement, that he remained charged with capital murder for the Cumberland offenses, and that he was subject to a possible death sentence."

Moreover, before the district court, the Commonwealth introduced another affidavit from Blessing, in which he swore, "At the time Cruse testified against Williams in Cumberland County, he had no agreement or understanding, formal or informal, with the Commonwealth." The district court thus properly credited the state court's judgment, and there is no reason for federal courts to revisit the state court's determination in a federal hearing in view of the unrefuted evidence. *See Eaton v. Angelone,* 139 F.3d 990, 995 (4th Cir.) (refusing to transform "a federal habeas proceeding into a second trial."), *cert. denied,* — U.S. —, 118 S.Ct. 2338, 141 L.Ed.2d 709 (1998); *Spencer v. Murray,* 18 F.3d 229 (4th Cir.1994) (upholding denial of habeas corpus on basis of trial counsel's affidavit); *Sawyers v. Collins,* 986 F.2d 1493, 1504 (5th Cir.1993) (en banc) (upholding denial of habeas corpus without evidentiary hearing even when state court made factual determination solely on basis of affidavits).

Finally, even if Williams could demonstrate that Cruse had an informal plea agreement, he could not show materiality. *See Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (demonstration of a *Brady* claim requires a showing of materiality). Given Williams' own testimony that he was at least an accomplice in the rape of Mrs. Keller and that he shot Mr. Keller in the head, we are confident there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.)). As a result, we agree that Williams failed to demonstrate a *Brady* violation.

B.

[redacted] Williams next argues that the prosecutor violated his Sixth Amendment right to be present at trial and to confront adverse witnesses. *See Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Sixth Amendment right to be present at trial); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (Sixth Amendment right to confront prosecution's witnesses). Specifically, Williams charges that prosecutor Woodson impermissibly burdened those rights when, on cross-examination, he asked Williams, "You're the only witness who has sat in here through this trial and heard the testimony of every witness before you got to testify; isn't that correct?"[1]

We need not decide whether allowing the prosecutor to proceed with this line of questioning was constitutional error because even if it were, the error was harmless. *See Sherman v. Smith,* 89 F.3d 1134, 1137 (4th Cir.1996) (en banc) (noting that harmless error analysis applies to similar trial errors such as improper comment on defendant's silence at trial). Woodson's line of questioning was clearly aimed at impeaching Williams' testimony in the eyes of the jury. Such impeachment, however, would only have undermined Williams' exculpatory testimony, leaving unaffected his inculpatory testimony. And, as noted, Williams' inculpatory testimony was devastating. In such circumstances, it is clear that the error, if that it was, did not have a "substantial and injurious effect or influence in determining the jury's verdict."

1. Indeed, the Supreme Court has recently granted certiorari on this very question. *Portuondo v. Agard,* — U.S. —, 119 S.Ct. 1248, 143 L.Ed.2d 346 (1999).

*Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted).

■■■ Williams' claim is similarly unavailing under pre-AEDPA law. Whether or not we would determine independently that Woodson's question violated Williams' Sixth Amendment rights, it is clear that such a holding would create a new rule. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Williams points to *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), to support his claim. In *Griffin,* the Supreme Court established that drawing a negative inference from the fact that a defendant has exercised his right to remain silent violates his Fifth Amendment rights. 380 U.S. at 613, 85 S.Ct. 1229. In *Brooks,* the Court held that requiring a defendant to testify first or not to testify at all also impermissibly burdened his Fifth Amendment right to remain silent. 406 U.S. at 613, 92 S.Ct. 1891. Neither decision held that it is constitutionally impermissible to impeach the defendant's testimony if he decides not to remain silent by commenting on his singular ability to hear the entirety of the preceding witnesses' testimony. Indeed, the Court in *Brooks* was careful to recognize the "risk of a defendant's coloring his testimony to conform to what has gone before" and to stress that "our adversary system reposes judgment of the credibility of all witnesses in the jury." *Id.* at 611, 92 S.Ct. 1891. In short, we cannot hold that either *Griffin* or *Brooks* "dictate[s]" a finding of constitutional error in circumstances such as these. *Stringer v. Black,* 503 U.S. 222, 228, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

The district court correctly denied Williams' requests for relief on these two claims.

## IV.

### A.

■■■ Williams next argues that the district court misinterpreted 21 U.S.C. § 848(q)(9). Section 848(q)(9) governs the granting of expert assistance to indigent prisoners in connection with their federal habeas proceedings, providing that

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10). *No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality.* Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

*Id.* (emphasis added).

Williams contends that the district court erred in interpreting this section to require Williams to show a need for confidentiality in an adversary hearing. When the district court made that determination, Williams refused to participate in an adversary hearing, and the district court denied his request for expert assistance.

We agree with the district court. In limiting *ex parte* requests for expert assistance, Congress was clearly addressing the routine approval of such requests even in those instances where expert or investigative services were unnecessary. Section 848(q)(9) explicitly provides that there shall be no "ex parte ... communication ... pursuant to this section" without a showing of a need for confidentiality. *Id.* Allowing an *ex parte* hearing to determine the need for an *ex parte* hearing not only seems convoluted, but it also runs afoul of the plain language of the statute. *See United States v. Gonzales,* 150 F.3d 1246, 1264 (10th Cir.1998) (process is one that

"is *not* to be held ex parte *unless* a proper showing is made concerning the need for confidentiality." (emphasis added) (internal quotation marks omitted)), *cert. denied sub nom. Albuquerque Journal v. Gonzales,* —— U.S. ——, 119 S.Ct. 918, 142 L.Ed.2d 915 (1999); *Patrick v. Johnson,* 37 F.Supp.2d 815, 816 (N.D.Tex.1999) ("Section 848(q)(9) clearly requires 'a proper showing ... concerning the need for confidentiality' before the Court may consider *any ex parte* communication or request." (emphasis added) (quoting 21 U.S.C. § 848(q)(9))).

The district court also rightly denied Williams' request for expert assistance. When Williams refused to proceed after the district court required him to demonstrate his need for confidentiality in an adversary hearing, he necessarily failed to show that expert services were "reasonably necessary." 21 U.S.C. § 848(q)(9).[2]

### B.

◼ Finally, Williams argues that the district court erred by requiring him to file his federal habeas petition within 180 days of April 24, 1996—the AEDPA's enactment date—pursuant to 28 U.S.C. § 2263. Williams contends that section 2263 applies only to "opt-in" states—those states that have met certain requirements pertaining to, *inter alia,* the appointment and compensation of counsel for post-conviction relief proceedings. Because this circuit has not yet recognized Virginia as an "opt-in" state, Williams contends that applying section 2263 was error. Instead, Williams maintains, the district court should have granted him one year from the effective date of the AEDPA to develop his petition further. *See Brown v. Angelone,* 150 F.3d

370, 375 (4th Cir.1998) (granting petitioners whose convictions became final in a non-opt-in state before the effective date of the AEDPA one year from the effective date to file their petitions).

Any error here was harmless. Williams' case remained in district court for a year and a half after he filed his petition. Yet Williams made not one motion to amend on the basis of claims developed during the petition's pendency. Furthermore, although Williams requests a remand for an additional five months in which to amend his petition now, he provides no additional claims he might like to add. In all events, Williams cannot demonstrate that the district court's error prejudiced him.

### V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

2. We are unpersuaded by Williams' argument that our interpretation of section 848(q)(9) renders it unconstitutional. Williams' sole contention is that any reading of section 848(q)(9) that requires a petitioner to divulge confidential information impermissibly impinges on his right of access to the courts. *See Gardner v. California,* 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (1969) (requiring that hearing transcripts that are made available to all be provided to indigent habeas petitioners to guarantee access to the courts). We do no more here than uphold the district court's determination that petitioner must demonstrate his need for confidentiality at a hearing. What information is disclosed at that hearing would of course remain within the discretion of the district court.