# WILLIAMS *v.* TAYLOR, WARDEN

No. 99–6615.   Argued February 28, 2000—Decided April 18, 2000

422

KENNEDY, J., delivered the opinion for a unanimous Court.

*John H. Blume* argued the cause for petitioner. With him on the briefs were *Keir M. Weyble, Barbara L. Hartung,* by appointment of the Court, 528 U. S. 1044, and *James E. Moore.*

*Donald R. Curry,* Senior Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief was *Mark L. Earley,* Attorney General.*

---

*A brief of *amici curiae* urging affirmance was filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *David P. Druliner,* Chief Assistant Attorney General, *John R. Gorey,* Acting Senior Assistant Attorney General, and *Donald E. De Nicola,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Janet Napolitano* of Arizona, *Mark Pryor* of Arkansas, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota,

JUSTICE KENNEDY delivered the opinion of the Court.

Petitioner Michael Wayne Williams received a capital sentence for the murders of Morris Keller, Jr., and Keller's wife, Mary Elizabeth. Petitioner later sought a writ of habeas corpus in federal court. Accompanying his petition was a request for an evidentiary hearing on constitutional claims which, he alleged, he had been unable to develop in state-court proceedings. The question in this case is whether 28 U. S. C. § 2254(e)(2) (1994 ed., Supp. III), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, bars the evidentiary hearing petitioner seeks. If petitioner "has failed to develop the factual basis of [his] claim[s] in State court proceedings," his case is subject to § 2254(e)(2), and he may not receive a hearing because he concedes his inability to satisfy the statute's further stringent conditions for excusing the deficiency.

I

On the evening of February 27, 1993, Verena Lozano James dropped off petitioner and his friend Jeffrey Alan Cruse near a local store in a rural area of Cumberland County, Virginia. The pair planned to rob the store's employees and customers using a .357 revolver petitioner had stolen in the course of a quadruple murder and robbery he had committed two months earlier. Finding the store closed, petitioner and Cruse walked to the Kellers' home. Petitioner was familiar with the couple, having grown up down the road from where they lived. He told Cruse they would have "a couple thousand dollars." App. 78. Cruse, who had been holding the .357, handed the gun to petitioner and knocked on the door. When Mr. Keller opened the door, petitioner pointed the gun at him as the two intruders forced their way inside. Petitioner and Cruse forced Mr. Keller to the kitchen, where

*John Cornyn* of Texas, *Jan Graham* of Utah, and *Christine O. Gregoire* of Washington.

they discovered Mrs. Keller. Petitioner ordered the captives to remove their clothing. While petitioner kept guard on the Kellers, Cruse searched the house for money and other valuables. He found a .38-caliber handgun and bullets. Upon Cruse's return to the kitchen, petitioner had Cruse tie their captives with telephone cords. The Kellers were confined to separate closets while the intruders continued ransacking the house.

When they gathered all they wanted, petitioner and Cruse decided to rape Mrs. Keller. With Mrs. Keller pleading with them not to hurt her or her husband, petitioner raped her. Cruse did the same. Petitioner then ordered the Kellers to shower and dress and "take a walk" with him and Cruse. *Id.*, at 97. As they were leaving, petitioner told Mrs. Keller he and Cruse were going to burn down the house. Mrs. Keller begged to be allowed to retrieve her marriage license, which she did, guarded by petitioner.

As the prosecution later presented the case, details of the murders were as follows. Petitioner, now carrying the .38, and Cruse, carrying the .357, took the Kellers to a thicket down a dirt road from the house. With petitioner standing behind Mr. Keller and Cruse behind Mrs. Keller, petitioner told Cruse, "We'll shoot at the count of three." *Id.*, at 103. At the third count, petitioner shot Mr. Keller in the head, and Mr. Keller collapsed to the ground. Cruse did not shoot Mrs. Keller at the same moment. Saying "he didn't want to leave no witnesses," petitioner urged Cruse to shoot Mrs. Keller. *Ibid.* Cruse fired one shot into her head. Despite his wound, Mr. Keller stood up, but petitioner shot him a second time. To ensure the Kellers were dead, petitioner shot each of them two or three more times.

After returning to the house and loading the stolen property into the Kellers' jeep, petitioner and Cruse set fire to the house and drove the jeep to Fredericksburg, Virginia, where they sold some of the property. They threw the re-

maining property and the .357 revolver into the Rappahannock River and set fire to the jeep.

Pursuing a lead from Verena James, the police interviewed Cruse about the fire at the Kellers' home. Petitioner had fled to Florida. Cruse provided no useful information until the police discovered the bodies of the victims, at which point Cruse consulted counsel. In a plea bargain Cruse agreed to disclose the details of the crimes in exchange for the Commonwealth's promise not to seek the death penalty against him. Cruse described the murders but made no mention of his own act of rape. When the Commonwealth discovered the omission, it revoked the plea agreement and charged Cruse with capital murder.

Petitioner was arrested and charged with robbery, abduction, rape, and the capital murders of the Kellers. At trial in January 1994, Cruse was the Commonwealth's main witness. He recounted the murders as we have just described. Cruse testified petitioner raped Mrs. Keller, shot Mr. Keller at least twice, and shot Mrs. Keller several times after she had been felled by Cruse's bullet. He also described petitioner as the mastermind of the murders. The circumstances of the first plea agreement between the Commonwealth and Cruse and its revocation were disclosed to the jury. *Id.*, at 158–159. Testifying on his own behalf, petitioner admitted he was the first to shoot Mr. Keller and it was his idea to rob the store and set fire to the house. He denied, however, raping or shooting Mrs. Keller, and claimed to have shot Mr. Keller only once. Petitioner blamed Cruse for the remaining shots and disputed some other parts of Cruse's testimony.

The jury convicted petitioner on all counts. After considering the aggravating and mitigating evidence presented during the sentencing phase, the jury found the aggravating circumstances of future dangerousness and vileness of the crimes and recommended a death sentence. The trial court imposed the recommended sentence. The Supreme Court

of Virginia affirmed petitioner's convictions and sentence, *Williams* v. *Commonwealth*, 248 Va. 528, 450 S. E. 2d 365 (1994), and we denied certiorari, *Williams* v. *Virginia*, 515 U. S. 1161 (1995). In a separate proceeding, Cruse pleaded guilty to the capital murder of Mrs. Keller and the first-degree murder of Mr. Keller. After the prosecution asked the sentencing court to spare his life because of his testimony against petitioner, Cruse was sentenced to life imprisonment.

Petitioner filed a habeas petition in state court alleging, in relevant part, that the Commonwealth failed to disclose a second agreement it had reached with Cruse after the first one was revoked. The new agreement, petitioner alleged, was an informal undertaking by the prosecution to recommend a life sentence in exchange for Cruse's testimony. Finding no merit to petitioner's claims, the Virginia Supreme Court dismissed the habeas petition, and we again denied certiorari. *Williams* v. *Netherland*, 519 U. S. 877 (1996).

Petitioner filed a habeas petition in the United States District Court for the Eastern District of Virginia on November 20, 1996. In addition to his claim regarding the alleged undisclosed agreement between the Commonwealth and Cruse, the petition raised three claims relevant to questions now before us. First, petitioner claimed the prosecution had violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), in failing to disclose a report of a confidential pretrial psychiatric examination of Cruse. Second, petitioner alleged his trial was rendered unfair by the seating of a juror who at *voir dire* had not revealed possible sources of bias. Finally, petitioner alleged one of the prosecutors committed misconduct in failing to reveal his knowledge of the juror's possible bias.

The District Court granted an evidentiary hearing on the undisclosed agreement and the allegations of juror bias and prosecutorial misconduct but denied a hearing on the psychiatric report. Before the evidentiary hearing could be held, the Commonwealth filed an application for an emergency

stay and a petition for a writ of mandamus and prohibition in the Court of Appeals. The Commonwealth argued that petitioner's evidentiary hearing was prohibited by 28 U. S. C. § 2254(e)(2) (1994 ed., Supp. III). A divided panel of the Court of Appeals granted the emergency stay and remanded for the District Court to apply the statute to petitioner's request for an evidentiary hearing. On remand, the District Court vacated its order granting an evidentiary hearing and dismissed the petition, having determined petitioner could not satisfy § 2254(e)(2)'s requirements.

The Court of Appeals affirmed. It first considered petitioner's argument that § 2254(e)(2) did not apply to his case because he had been diligent in attempting to develop his claims in state court. Citing its decision in *Cardwell* v. *Greene*, 152 F. 3d 331 (CA4), cert. denied, 525 U. S. 1037 (1998), the Court of Appeals agreed with petitioner that § 2254(e)(2) would not apply if he had exercised diligence in state court. The court held, however, that petitioner had not been diligent and so had "failed to develop" in state court the factual bases of his *Brady*, juror bias, and prosecutorial misconduct claims. See 189 F. 3d 421, 426 (CA4 1999). The Court of Appeals concluded petitioner could not satisfy the statute's conditions for excusing his failure to develop the facts and held him barred from receiving an evidentiary hearing. The Court of Appeals ruled in the alternative that, even if § 2254(e)(2) did not apply, petitioner would be ineligible for an evidentiary hearing under the cause and prejudice standard of pre-AEDPA law. See *id.*, at 428.

Addressing petitioner's claim of an undisclosed informal agreement between the Commonwealth and Cruse, the Court of Appeals rejected it on the merits under 28 U. S. C. § 2254(d)(1) and, as a result, did not consider whether § 2254(e)(2) applied. See 189 F. 3d, at 429.

On October 18, 1999, petitioner filed an application for stay of execution and a petition for a writ of certiorari. On Octo-

ber 28, we stayed petitioner's execution and granted certiorari to decide whether § 2254(e)(2) precludes him from receiving an evidentiary hearing on his claims. See 528 U. S. 960 (1999). We now affirm in part and reverse in part.

## II

### A

Petitioner filed his federal habeas petition after AEDPA's effective date, so the statute applies to his case. See *Lindh* v. *Murphy*, 521 U. S. 320, 326–327 (1997). The Commonwealth argues AEDPA bars petitioner from receiving an evidentiary hearing on any claim whose factual basis was not developed in state court, absent narrow circumstances not applicable here. Petitioner did not develop, or raise, his claims of juror bias, prosecutorial misconduct, or the prosecution's alleged *Brady* violation regarding Cruse's psychiatric report until he filed his federal habeas petition. Petitioner explains he could not have developed the claims earlier because he was unaware, through no fault of his own, of the underlying facts. As a consequence, petitioner contends, AEDPA erects no barrier to an evidentiary hearing in federal court.

Section 2254(e)(2), the provision which controls whether petitioner may receive an evidentiary hearing in federal district court on the claims that were not developed in the Virginia courts, becomes the central point of our analysis. It provides as follows:

> "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> "(A) the claim relies on—
>
> "(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

"(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

"(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

By the terms of its opening clause the statute applies only to prisoners who have "failed to develop the factual basis of a claim in State court proceedings." If the prisoner has failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2). Here, petitioner concedes his case does not comply with § 2254(e)(2)(B), see Brief for Petitioner 25, so he may receive an evidentiary hearing only if his claims fall outside the opening clause.

There was no hearing in state court on any of the claims for which petitioner now seeks an evidentiary hearing. That, says the Commonwealth, is the end of the matter. In its view petitioner, whether or not through his own fault or neglect, still "failed to develop the factual basis of a claim in State court proceedings." Petitioner, on the other hand, says the phrase "failed to develop" means lack of diligence in developing the claims, a defalcation he contends did not occur since he made adequate efforts during state-court proceedings to discover and present the underlying facts. The Court of Appeals agreed with petitioner's interpretation of § 2254(e)(2) but believed petitioner had not exercised enough diligence to avoid the statutory bar. See 189 F. 3d, at 426. We agree with petitioner and the Court of Appeals that "failed to develop" implies some lack of diligence; but, unlike the Court of Appeals, we find no lack of diligence on petitioner's part with regard to two of his three claims.

## B

We start, as always, with the language of the statute. See *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989). Section 2254(e)(2) begins with a conditional clause, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," which directs attention to the prisoner's efforts in state court. We ask first whether the factual basis was indeed developed in state court, a question susceptible, in the normal course, of a simple yes or no answer. Here the answer is no.

The Commonwealth would have the analysis begin and end there. Under its no-fault reading of the statute, if there is no factual development in the state court, the federal habeas court may not inquire into the reasons for the default when determining whether the opening clause of § 2254(e)(2) applies. We do not agree with the Commonwealth's interpretation of the word "failed."

We do not deny "fail" is sometimes used in a neutral way, not importing fault or want of diligence. So the phrase "We fail to understand his argument" can mean simply "We cannot understand his argument." This is not the sense in which the word "failed" is used here, however.

We give the words of a statute their " 'ordinary, contemporary, common meaning,' " absent an indication Congress intended them to bear some different import. *Walters* v. *Metropolitan Ed. Enterprises, Inc.*, 519 U. S. 202, 207 (1997) (quoting *Pioneer Investment Services Co.* v. *Brunswick Associates Ltd. Partnership*, 507 U. S. 380 (1993)). See also *Bailey* v. *United States*, 516 U. S. 137, 141 (1995). In its customary and preferred sense, "fail" connotes some omission, fault, or negligence on the part of the person who has failed to do something. See, *e. g.*, Webster's New International Dictionary 910 (2d ed. 1939) (defining "fail" as "to be wanting; to fall short; to be or become deficient in any measure or degree," and "failure" as "a falling short," "a deficiency or

lack," and an "[o]mission to perform"); Webster's New International Dictionary 814 (3d ed. 1993) ("to leave some possible or expected action unperformed or some condition unachieved"). See also Black's Law Dictionary 594 (6th ed. 1990) (defining "fail" as "[f]ault, negligence, or refusal"). To say a person has failed in a duty implies he did not take the necessary steps to fulfill it. He is, as a consequence, at fault and bears responsibility for the failure. In this sense, a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance. Fault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all. We conclude Congress used the word "failed" in the sense just described. Had Congress intended a no-fault standard, it would have had no difficulty in making its intent plain. It would have had to do no more than use, in lieu of the phrase "has failed to," the phrase "did not."

Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel. In this we agree with the Court of Appeals and with all other courts of appeals which have addressed the issue. See, *e. g., Baja* v. *Ducharme,* 187 F. 3d 1075, 1078–1079 (CA9 1999); *Miller* v. *Champion,* 161 F. 3d 1249, 1253 (CA10 1998); *Cardwell,* 152 F. 3d, at 337; *McDonald* v. *Johnson,* 139 F. 3d 1056, 1059 (CA5 1998); *Burris* v. *Parke,* 116 F. 3d 256, 258 (CA7 1997); *Love* v. *Morton,* 112 F. 3d 131, 136 (CA3 1997).

Our interpretation of § 2254(e)(2)'s opening clause has support in *Keeney* v. *Tamayo-Reyes,* 504 U. S. 1 (1992), a case decided four years before AEDPA's enactment. In *Keeney,* a prisoner with little knowledge of English sought an evidentiary hearing in federal court, alleging his *nolo contendere* plea to a manslaughter charge was not knowing and voluntary because of inaccuracies in the translation of the plea

proceedings. The prisoner had not developed the facts of his claim in state collateral proceedings, an omission caused by the negligence of his state postconviction counsel. See *id.*, at 4, 8–9. The Court characterized this as the "prisoner's failure to develop material facts in state court." *Id.*, at 8. We required the prisoner to demonstrate cause and prejudice excusing the default before he could receive a hearing on his claim, *ibid.*, unless the prisoner could "show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," *id.*, at 12.

Section 2254(e)(2)'s initial inquiry into whether "the applicant has failed to develop the factual basis of a claim in State court proceedings" echoes *Keeney*'s language regarding "the state prisoner's failure to develop material facts in state court." In *Keeney*, the Court borrowed the cause and prejudice standard applied to procedurally defaulted claims, see *Wainwright* v. *Sykes*, 433 U. S. 72, 87–88 (1977), deciding there was no reason "to distinguish between failing to properly assert a federal claim in state court and failing in state court to properly develop such a claim." *Keeney, supra,* at 8. As is evident from the similarity between the Court's phrasing in *Keeney* and the opening clause of § 2254(e)(2), Congress intended to preserve at least one aspect of *Keeney*'s holding: prisoners who are at fault for the deficiency in the state-court record must satisfy a heightened standard to obtain an evidentiary hearing. To be sure, in requiring that prisoners who have not been diligent satisfy § 2254(e)(2)'s provisions rather than show cause and prejudice, and in eliminating a freestanding "miscarriage of justice" exception, Congress raised the bar *Keeney* imposed on prisoners who were not diligent in state-court proceedings. Contrary to the Commonwealth's position, however, there is no basis in the text of § 2254(e)(2) to believe Congress used "fail" in a different sense than the Court did in *Keeney* or otherwise intended the statute's further, more stringent requirements to control the availability of an evidentiary hear-

434

ing in a broader class of cases than were covered by *Keeney*'s cause and prejudice standard.

In sum, the opening clause of § 2254(e)(2) codifies *Keeney*'s threshold standard of diligence, so that prisoners who would have had to satisfy *Keeney*'s test for excusing the deficiency in the state-court record prior to AEDPA are now controlled by § 2254(e)(2). When the words of the Court are used in a later statute governing the same subject matter, it is respectful of Congress and of the Court's own processes to give the words the same meaning in the absence of specific direction to the contrary. See *Lorillard* v. *Pons*, 434 U. S. 575, 581 (1978) ("[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute"). See also *Cottage Savings Assn.* v. *Commissioner*, 499 U. S. 554, 562 (1991).

Interpreting § 2254(e)(2) so that "failed" requires lack of diligence or some other fault avoids putting it in needless tension with § 2254(d). A prisoner who developed his claim in state court and can prove the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," is not barred from obtaining relief by § 2254(d)(1). See *Williams* v. *Taylor, ante,* at 412–413 (majority opinion). If the opening clause of § 2254(e)(2) covers a request for an evidentiary hearing on a claim which was pursued with diligence but remained undeveloped in state court because, for instance, the prosecution concealed the facts, a prisoner lacking clear and convincing evidence of innocence could be barred from a hearing on the claim even if he could satisfy § 2254(d). See 28 U. S. C. § 2254(e)(2)(B). The "failed to develop" clause does not bear this harsh reading, which would attribute to Congress a purpose or design to bar evidentiary hearings for diligent prisoners with meritorious claims just because the prosecution's

conduct went undetected in state court. We see no indication that Congress by this language intended to remove the distinction between a prisoner who is at fault and one who is not.

The Commonwealth argues a reading of "failed to develop" premised on fault empties § 2254(e)(2)(A)(ii) of its meaning. To treat the prisoner's lack of diligence in state court as a prerequisite for application of § 2254(e)(2), the Commonwealth contends, renders a nullity of the statute's own diligence provision requiring the prisoner to show "a factual predicate [of his claim] could not have been previously discovered through the exercise of due diligence." § 2254(e)(2)(A)(ii). We disagree.

The Commonwealth misconceives the inquiry mandated by the opening clause of § 2254(e)(2). The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful. Though lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain, see § 2254(e)(2)(A)(ii), and there is a convincing claim of innocence, see § 2254(e)(2)(B), only a prisoner who has neglected his rights in state court need satisfy these conditions. The statute's later reference to diligence pertains to cases in which the facts could not have been discovered, whether there was diligence or not. In this important respect § 2254(e)(2)(A)(ii) bears a close resemblance to (e)(2)(A)(i), which applies to a new rule that was not available at the time of the earlier proceedings. Cf. *Gutierrez* v. *Ada*, 528 U. S. 250, 255 (2000) ("[W]ords and people are known by

their companions"). Cf. also *United States* v. *Locke, ante,* at 105. In these two parallel provisions Congress has given prisoners who fall within § 2254(e)(2)'s opening clause an opportunity to obtain an evidentiary hearing where the legal or factual basis of the claims did not exist at the time of state-court proceedings.

We are not persuaded by the Commonwealth's further argument that anything less than a no-fault understanding of the opening clause is contrary to AEDPA's purpose to further the principles of comity, finality, and federalism. There is no doubt Congress intended AEDPA to advance these doctrines. Federal habeas corpus principles must inform and shape the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts. In keeping this delicate balance we have been careful to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings. See, *e. g., Coleman* v. *Thompson,* 501 U. S. 722, 726 (1991) ("This is a case about federalism. It concerns the respect that federal courts owe the States and the States' procedural rules when reviewing the claims of state prisoners in federal habeas corpus"); *McCleskey* v. *Zant,* 499 U. S. 467, 493 (1991) ("[T]he doctrines of procedural default and abuse of the writ are both designed to lessen the injury to a State that results through reexamination of a state conviction on a ground that the State did not have the opportunity to address at a prior, appropriate time; and both doctrines seek to vindicate the State's interest in the finality of its criminal judgments").

It is consistent with these principles to give effect to Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus, while recognizing the statute does not equate prisoners who exercise diligence in pursuing their claims with those who do not. Principles of exhaustion are premised upon recognition by Congress and the Court that state judiciaries have the duty and competence to vindicate

rights secured by the Constitution in state criminal proceedings. Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law. "Comity . . . dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *O'Sullivan* v. *Boerckel,* 526 U. S. 838, 844 (1999). For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings. Yet comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2).

## III

Now we apply the statutory test. If there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not "failed to develop" the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements. We find lack of diligence as to one of the three claims but not as to the other two.

## A

Petitioner did not exercise the diligence required to preserve the claim that nondisclosure of Cruse's psychiatric re-

port was in contravention of *Brady* v. *Maryland*, 373 U. S. 83 (1963). The report concluded Cruse "ha[d] little recollection of the [murders of the Kellers], other than vague memories, as he was intoxicated with alcohol and marijuana at the time." App. 495. The report had been prepared in September 1993, before petitioner was tried; yet it was not mentioned by petitioner until he filed his federal habeas petition and attached a copy of the report. Petitioner explained that an investigator for his federal habeas counsel discovered the report in Cruse's court file but state habeas counsel had not seen it when he had reviewed the same file. State habeas counsel averred as follows:

> "Prior to filing [petitioner's] habeas corpus petition with the Virginia Supreme Court, I reviewed the Cumberland County court files of [petitioner] and of his codefendant, Jeffrey Cruse. . . . I have reviewed the attached psychiatric evaluation of Jeffrey Cruse . . . . I have no recollection of seeing this report in Mr. Cruse's court file when I examined the file. Given the contents of the report, I am confident that I would remember it." *Id.*, at 625–626.

The trial court was not satisfied with this explanation for the late discovery. Nor are we.

There are repeated references to a "psychiatric" or "mental health" report in a transcript of Cruse's sentencing proceeding, a copy of which petitioner's own state habeas counsel attached to the state habeas petition he filed with the Virginia Supreme Court. The transcript reveals that Cruse's attorney described the report with details that should have alerted counsel to a possible *Brady* claim. As Cruse's attorney said:

> "The psychiatric report . . . point[s] out that [Cruse] is significantly depressed. He suffered from post traumatic stress. His symptoms include nightmares, sleeplessness, sobbing, reddening of the face, severe depres-

sion, flash backs . . . . [T]he psychological report states he is overwhelmed by feelings of guilt and shame in his actions. He is numb. He is trying to suppress his feelings, but when he has feelings, there is only pain and sadness." App. 424.

The description accords with the contents of the psychiatric report, which diagnosed Cruse as suffering from post-traumatic stress disorder:

"[Cruse] has recurrent nightmares and visualizes the face of the woman that he killed. When attempting to describe this nightmare, he breaks openly into tears and his face reddens. . . . He continues to feel worthless as a person . . . . He has no hope for his future and has been thinking of suicide constantly. . . . He does describe inability to sleep, often tossing and turning, waking up, and feeling fatigued during the day. . . . He described neurovegetative symptoms of major depression and post-traumatic nightmares, recurrent in nature, of the [murders]." *Id.*, at 495–499.

The transcript put petitioner's state habeas counsel on notice of the report's existence and possible materiality. The sole indication that counsel made some effort to investigate the report is an October 30, 1995, letter to the prosecutor in which counsel requested "[a]ll reports of physical and mental examinations, scientific tests, or experiments conducted in connection with the investigation of the offense, including but not limited to: . . . [a]ll psychological test or polygraph examinations performed upon any prosecution witness and all documents referring or relating to such tests . . . ." *Id.*, at 346–347. After the prosecution declined the requests absent a court order, *id.*, at 353, it appears counsel made no further efforts to find the specific report mentioned by Cruse's attorney. Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references

in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

As we hold there was a failure to develop the factual basis of this *Brady* claim in state court, we must determine if the requirements in the balance of § 2254(e)(2) are satisfied so that petitioner's failure is excused. Subparagraph (B) of § 2254(e)(2) conditions a hearing upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error. Petitioner concedes he cannot make this showing, see Brief for Petitioner 25, and the case has been presented to us on that premise. For these reasons, we affirm the Court of Appeals' judgment barring an evidentiary hearing on this claim.

### B

We conclude petitioner has met the burden of showing he was diligent in efforts to develop the facts supporting his juror bias and prosecutorial misconduct claims in collateral proceedings before the Virginia Supreme Court.

Petitioner's claims are based on two of the questions posed to the jurors by the trial judge at *voir dire.* First, the judge asked prospective jurors, "Are any of you related to the following people who may be called as witnesses?" Then he read the jurors a list of names, one of which was "Deputy Sheriff Claude Meinhard." Bonnie Stinnett, who would later become the jury foreperson, had divorced Meinhard in 1979, after a 17-year marriage with four children. Stinnett remained silent, indicating the answer was "no." Meinhard, as the officer who investigated the crime scene and interrogated Cruse, would later become the prosecution's lead-off witness at trial.

After reading the names of the attorneys involved in the case, including one of the prosecutors, Robert Woodson, Jr., the judge asked, "Have you or any member of your immediate family ever been represented by any of the aforemen-

tioned attorneys?" Stinnett again said nothing, despite the fact Woodson had represented her during her divorce from Meinhard. App. 483, 485.

In an affidavit she provided in the federal habeas proceedings, Stinnett claimed "[she] did not respond to the judge's [first] question because [she] did not consider [herself] 'related' to Claude Meinhard in 1994 [at *voir dire*] . . . . Once our marriage ended in 1979, I was no longer related to him." *Id.*, at 627. As for Woodson's earlier representation of her, Stinnett explained as follows:

> "When Claude and I divorced in 1979, the divorce was uncontested and Mr. Woodson drew up the papers so that the divorce could be completed. Since neither Claude nor I was contesting anything, I didn't think Mr. Woodson 'represented' either one of us." *Id.*, at 628.

Woodson provided an affidavit in which he admitted "[he] was aware that Juror Bonnie Stinnett was the ex-wife of then Deputy Sheriff Claude Meinhard and [he] was aware that they had been divorced for some time." *Id.*, at 629. Woodson stated, however, "[t]o [his] mind, people who are related only by marriage are no longer 'related' once the marriage ends in divorce." *Ibid.* Woodson also "had no recollection of having been involved as a private attorney in the divorce proceedings between Claude Meinhard and Bonnie Stinnett." *Id.*, at 629–630. He explained that "[w]hatever [his] involvement was in the 1979 divorce, by the time of trial in 1994 [he] had completely forgotten about it." *Id.*, at 630.

Even if Stinnett had been correct in her technical or literal interpretation of the question relating to Meinhard, her silence after the first question was asked could suggest to the finder of fact an unwillingness to be forthcoming; this in turn could bear on the veracity of her explanation for not disclosing that Woodson had been her attorney. Stinnett's failure to divulge material information in response to the second

question was misleading as a matter of fact because, under any interpretation, Woodson had acted as counsel to her and Meinhard in their divorce. Coupled with Woodson's own reticence, these omissions as a whole disclose the need for an evidentiary hearing. It may be that petitioner could establish that Stinnett was not impartial, see *Smith* v. *Phillips*, 455 U. S. 209, 217, 219–221 (1982), or that Woodson's silence so infected the trial as to deny due process, see *Donnelly* v. *DeChristoforo*, 416 U. S. 637, 647–648 (1974).

In ordering an evidentiary hearing on the juror bias and prosecutorial misconduct claims, the District Court concluded the factual basis of the claims was not reasonably available to petitioner's counsel during state habeas proceedings. After the Court of Appeals vacated this judgment, the District Court dismissed the petition and the Court of Appeals affirmed under the theory that state habeas counsel should have discovered Stinnett's relationship to Meinhard and Woodson. See 189 F. 3d, at 428.

We disagree with the Court of Appeals on this point. The trial record contains no evidence which would have put a reasonable attorney on notice that Stinnett's nonresponse was a deliberate omission of material information. State habeas counsel did attempt to investigate petitioner's jury, though prompted by concerns about a different juror. App. 388–389. Counsel filed a motion for expert services with the Virginia Supreme Court, alleging "irregularities, improprieties and omissions exist[ed] with respect to the empaneling [sic] of the jury." *Id.*, at 358. Based on these suspicions, counsel requested funding for an investigator "to examine all circumstances relating to the empanelment of the jury and the jury's consideration of the case." *Ibid.* The Commonwealth opposed the motion, and the Virginia Supreme Court denied it and dismissed the habeas petition, depriving petitioner of a further opportunity to investigate. The Virginia Supreme Court's denial of the motion is understandable in light of petitioner's vague allegations, but the

vagueness was not the fault of petitioner. Counsel had no reason to believe Stinnett had been married to Meinhard or been represented by Woodson. The underdevelopment of these matters was attributable to Stinnett and Woodson, if anyone. We do not suggest the State has an obligation to pay for investigation of as yet undeveloped claims; but if the prisoner has made a reasonable effort to discover the claims to commence or continue state proceedings, § 2254(e)(2) will not bar him from developing them in federal court.

The Court of Appeals held state habeas counsel was not diligent because petitioner's investigator on federal habeas discovered the relationships upon interviewing two jurors who referred in passing to Stinnett as "Bonnie Meinhard." See Brief for Petitioner 35. The investigator later confirmed Stinnett's prior marriage to Meinhard by checking Cumberland County's public records. See 189 F. 3d, at 426 ("The documents supporting [petitioner's] Sixth Amendment claims have been a matter of public record since Stinnett's divorce became final in 1979. Indeed, because [petitioner's] federal habeas counsel located those documents, there is little reason to think that his state habeas counsel could not have done so as well"). We should be surprised, to say the least, if a district court familiar with the standards of trial practice were to hold that in all cases diligent counsel must check public records containing personal information pertaining to each and every juror. Because of Stinnett and Woodson's silence, there was no basis for an investigation into Stinnett's marriage history. Section 2254(e)(2) does not apply to petitioner's related claims of juror bias and prosecutorial misconduct.

We further note the Commonwealth has not argued that petitioner could have sought relief in state court once he discovered the factual bases of these claims some time between appointment of federal habeas counsel on July 2, 1996, and the filing of his federal habeas petition on November 20, 1996. As an indigent, petitioner had 120 days following ap-

pointment of state habeas counsel to file a petition with the Virginia Supreme Court. Va. Code Ann. § 8.01–654.1 (1999). State habeas counsel was appointed on August 10, 1995, about a year before petitioner's investigator on federal habeas uncovered the information regarding Stinnett and Woodson. As state postconviction relief was no longer available at the time the facts came to light, it would have been futile for petitioner to return to the Virginia courts. In these circumstances, though the state courts did not have an opportunity to consider the new claims, petitioner cannot be said to have failed to develop them in state court by reason of having neglected to pursue remedies available under Virginia law.

Our analysis should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the first instance. Questions regarding the standard for determining the prejudice that petitioner must establish to obtain relief on these claims can be addressed by the Court of Appeals or the District Court in the course of further proceedings. These courts, in light of cases such as *Smith, supra,* at 215 ("[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"), will take due account of the District Court's earlier decision to grant an evidentiary hearing based in part on its belief that "Juror Stinnett deliberately failed to tell the truth on voir dire." *Williams* v. *Netherland,* Civ. Action No. 3:96CV529 (ED Va., Apr. 13, 1998), App. 529, 557.

## IV

Petitioner alleges the Commonwealth failed to disclose an informal plea agreement with Cruse. The Court of Appeals rejected this claim on the merits under § 2254(d)(1), so it is unnecessary to reach the question whether § 2254(e)(2) would permit a hearing on the claim.

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*