In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00123-CR


______________________________




SHAMARCUS TWAIN JONES, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the County Court at Law


Cass County, Texas


Trial Court No. CCLM050135




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 Shamarcus Twain Jones attempts to appeal his conviction for driving while intoxicated
(DWI)--second offense. He was found guilty by a jury, and the jury assessed punishment at 270
days in the county jail. Jones' sentence was imposed June 7, 2007. His notice of appeal was filed
July 19, 2007. We received the clerk's record August 23, 2007. Further, the State has filed a motion
to dismiss this appeal. The issue before us is whether Jones timely filed his notice of appeal. We
conclude that he did not and dismiss the attempted appeal for want of jurisdiction.

 A timely notice of appeal is necessary to invoke this Court's jurisdiction. Olivo v. State, 918
S.W.2d 519, 522 (Tex. Crim. App. 1996). Rule 26.2(a) prescribes the time period in which a notice
of appeal must be filed by a defendant in order to perfect appeal in a criminal case. A defendant's
notice of appeal is timely if filed within thirty days after the day sentence is imposed or suspended
in open court, or within ninety days after sentencing if the defendant timely files a motion for new
trial. Tex. R. App. P. 26.2(a); Olivo, 918 S.W.2d at 522. The record does not contain any motion
for new trial. The last date Jones could timely file his notice of appeal was July 9, 2007, thirty days
after the day sentence was imposed in open court. See Tex. R. App. P. 26.2(a)(1); see also Tex. R.
App. P. 4.1(a). Further, no motion for extension of time was filed in this Court within fifteen days
of the last day allowed for filing the notice of appeal.


 Jones has failed to perfect his appeal. Accordingly, we grant the State's motion and dismiss
the appeal for want of jurisdiction.


 Jack Carter

 Justice


Date Submitted: September 5, 2007

Date Decided: September 6, 2007


Do Not Publish





 This fact is critical in our
analysis, because while there is little Texas caselaw on the issue of an implied bias doctrine, the issue
has been addressed by the United States Supreme Court. Accordingly, we turn to federal authority
for guidance.

 In its brief, the State properly points out that the United States Supreme Court has neither
adopted nor rejected the "implied bias" doctrine as it would apply under the federal Sixth
Amendment's right to a fair and impartial jury. Only Justice O'Connor has opined that the implied
bias doctrine should be applied in limited circumstances such as when the at-issue juror is revealed
to be an employee of the prosecuting agency, a close relative of one of the participants in the trial
or in the criminal transaction, or was a witness or somehow involved in the criminal transaction. 
Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring).

 Several years after Justice O'Connor's concurrence in Smith, the United States Supreme Court
had occasion to review by habeas corpus a case in which one of the applicant's jurors had not only
been related to the State's key witness, but had also been previously represented in a divorce
proceeding by the prosecutor. Williams v. Taylor, 529 U.S. 420 (2000). Justice Kennedy's
unanimous opinion in Williams can be read to suggest that prejudice would not be presumed on
account of the juror's service in that case; instead, the applicant had the burden of developing a
record that showed harm as a result of a trial before a juror who was both related to a witness and
who had been previously represented by one of the prosecutors. Id. at 441-44.

 Given that neither the Texas Court of Criminal Appeals nor the United States Supreme Court
has adopted the implied bias doctrine when it is discovered in the middle of a punishment trial that
a juror is a victim of the defendant's extraneous (misdemeanor-level) conduct, we shall not follow
Uranga's suggestion that such a doctrine must be applied in this case. Instead, we shall examine the
record for any evidence of actual bias on the part of the at-issue juror. For such evidence, we shall
examine the trial court's questioning of the juror at the time the issue arose during trial, as well as
any post-judgment evidence brought forth by the appellant in seeking a new trial.

 In the record now before us, the at-issue juror had not himself witnessed Uranga drive
through the juror's yard in the dead of night on September 20. Nor had that juror known, until
watching the videotape of the incident at trial, who might have caused the damage. The juror told
the trial court that he was not interested in pursuing criminal charges against Uranga on the basis of
what all parties agreed was "minimal" damage; instead, the juror intended to repair the landscaping
himself. (3) The juror also repeatedly promised the trial court that he would not use this incident
against Uranga in deciding the sentence. (4) Though Uranga's pro se motions for new trial raised the
issue of the trial court's failure to excuse the now at-issue juror during the punishment trial, the trial
court did not conduct a hearing on Uranga's post-conviction motions. Accordingly, we have no
evidence about this juror's service beyond the trial court's initial questioning amidst trial.

 The trial court was in the best position to weigh the believability of the juror's repeated
promises to both the court and the parties that, in deciding Uranga's punishment, he would not take
into account his status as the victim of Uranga's extraneous criminal mischief. Therefore, to the
extent that the record supports the trial court's conclusion that the juror would remain unbiased--and
absent any evidence to the contrary--we cannot say our de novo review of the record affirmatively
reveals a clear abuse of the trial court's discretion in ruling on Uranga's motion for a mistrial. (5) Cf.
Uttecht v. Brown, ___ U.S. ___, 127 S.Ct. 2218, 2224 (2007) (to evaluate claim that criminal
defendant's Sixth Amendment right to impartial jury has been abridged in capital cases, reviewing
courts should show deference to trial court's judgment based in part on demeanor of juror in
answering questions about ability to put aside alleged bias).

(2) Legally and Factually Sufficient Evidence Supports Uranga's Conviction

 The jury found Uranga guilty of two offenses: (1) possession of methamphetamine in an
amount greater than one gram but less than four grams and (2) theft of property valued at less than
$50.00. See Tex. Health & Safety Code Ann. § 481.102(6) (Vernon Supp. 2007)
(methamphetamine is penalty group 1 substance), § 481.115(c) (Vernon 2003) (prohibiting
possession of penalty group 1 substance in amount greater than 1 gram, less than 4 grams); Tex.
Penal Code Ann. § 31.03 (Vernon Supp. 2007) (theft). (6) Uranga now contends the evidence is
legally and factually insufficient to support his drug conviction. He asserts the State's evidence is
insufficient to demonstrate both actual possession of the alleged contraband and possession of any
unadulterated methamphetamine weighing more than one gram. 

 We will review Uranga's legal and factual sufficiency challenges under the applicable
appellate standards. See Muckelroy v. State, 206 S.W.3d 746, 747 (Tex. App.--Texarkana 2006,
pet. ref'd) (citing Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2006); Clewis v. State, 922
S.W.2d 126, 134 (Tex. Crim. App. 1996)); see also Sartain v. State, 228 S.W.3d 416, 420-21 (Tex.
App.--Fort Worth 2007, pet. ref'd). To support a conviction for possession of methamphetamine
in this case, the evidence adduced at trial must demonstrate Uranga (a) intentionally or knowingly;
(b) had "actual care, custody, control, or management"; (c) of methamphetamine; (d) in an amount
greater than one gram but less than four grams. See Tex. Health & Safety Code Ann.
§ 481.002(38) (Vernon Supp. 2007) (defining "possession"), § 481.115(a), (c) (Vernon 2003).

 The record reveals these facts: Kimberly Pinner was working for the Sears department store
in Wichita Falls August 19, 2005, when she detained two men (one of whom was Uranga) for
suspected shoplifting. When Pinner searched through Uranga's Dillard's shopping bag (in which
Pinner found several items believed to have been stolen from Sears), she found a satchel. Pinner
then unzipped this satchel and saw what appeared to be drugs inside. Pinner closed the satchel, put
it down in a location away from Uranga's reach, and continued questioning the suspects regarding
the thefts. Meanwhile, Uranga kept repeatedly reaching toward his ankle in an attempt to retrieve
something hidden inside his sock. These furtive movements made Pinner suspicious, and she
repeatedly asked Uranga to remain still until police arrived. But Uranga did not heed Pinner's
request; instead, he eventually regained possession of the satchel, which he opened to retrieve the
drugs, and attempted to swallow those drugs. Sears employees were ultimately able to pull the drugs
out of Uranga's mouth and regain control of the situation until police arrived. 

 Officer Brandie Young of the Wichita Falls Police Department later arrested Uranga. Young
identified a plastic bag found in Uranga's satchel as containing marihuana, which was marked and
admitted into evidence as State's Exhibit 3. See Tex. Health & Safety Code Ann. § 481.121
(Vernon 2003) (criminalizing possession of marihuana). Young further testified that, during a search
of Uranga (made pursuant to the arrest), the officer found digital scales--ultimately introduced as
State's Exhibit 4. A different bag, which was marked and admitted as State's Exhibit 2, contained
contraband of a different type, which Young sent to a chemical laboratory for scientific testing. 

 Officer Kevin Folmar, a ten-year veteran of the Wichita Falls Police Department and an
experienced narcotics officer, testified that drug dealers often have digital scales in their possession. 
The particular scale admitted in this case--which was found in Uranga's possession at the time of
his arrest--seemed to be such a scale. 

 William L. Todsen, a forensic chemist for the Texas Department of Public Safety Crime
Laboratory in Abilene, testified he analyzed the contents of State's Exhibit 2 and found it to contain
3.29 grams of methamphetamine. 

 Eli Ramos, Jr., testified on Uranga's behalf. At the time of trial, Ramos was incarcerated at
the Abilene County Jail. Ramos admitted being previously convicted of theft, credit card abuse,
burglary, and drug charges. (7) Ramos told the jury that, on August 19, 2005, he had met Uranga at the
Wichita Falls mall for the purpose of buying clothes for Uranga. Ramos said he had earlier
purchased several items at Dillard's using his credit card. When asked whether the marihuana and
methamphetamine found inside the Dillard's bag--of which Uranga had possession at the time he
was detained by Sears security personnel--actually belonged to Ramos, Ramos exercised his Fifth
Amendment right to not incriminate himself. See U.S. Const. amend. V. Ramos never
subsequently claimed ownership of the drugs found in Uranga's possession, though Ramos was given
more than one such opportunity. 

 We conclude the State's evidence was legally sufficient. The testimony showed Uranga,
immediately before being detained by Sears employees, had exercised sole possession of the Dillard's
shopping bag inside of which was found a smaller satchel containing the narcotics. Uranga later
attempted to destroy that drug evidence by eating it--a fact that suggests Uranga not only possessed
the drugs, but was aware of their illegality as well as the consequences of their being found in his
possession. The chemist's analysis showed the narcotics were methamphetamine and weighed within
the applicable statutory range for this prosecution. (8) And while Ramos' testimony might cast
suspicions on whether the drugs at issue originally came from him, his testimony in no way can be
said to provide enough evidence to cause us to doubt the legal or factual sufficiency of the jury's
verdict regarding whether Uranga's possession of the methamphetamine was "knowing" or
"intentional." Uranga's evidentiary sufficiency issues are overruled.

 








 Because (1) the record does not support a conclusion the trial court erred by denying Uranga's
motion for a mistrial during the punishment phase of the proceedings and (2) legally and factually
sufficient evidence supports the jury's verdict, we affirm the trial court's judgment.


 




 Josh R. Morriss, III

 Chief Justice


Date Submitted: January 9, 2008

Date Decided: February 21, 2008


Publish
1. Late in the evening of September 20, 2006, as Officer Piper patrolled an area of Wichita
Falls known for gang activity, Piper observed a vehicle failing to use a turn signal before making a
right-hand turn. See Tex. Transp. Code Ann. § 545.104 (Vernon 1999) (operator intending to turn
vehicle right or left shall signal). Piper followed the car and subsequently witnessed several
additional traffic violations. Eventually, Piper activated his patrol car's overhead lights and
attempted to make a traffic stop. Rather than yield to the officer's display of authority, the car fled. 
During the ensuing chase, the suspect drove his vehicle into a residential neighborhood, "swung a
turn wide, hit the curb, went up into someone's yard there on York Street, came out of the yard, back
onto York, and then accelerated [away]." The driver later abandoned his vehicle in a private
driveway and fled on foot. Other area police officers then joined the pursuit. The suspected driver,
identified in court as Uranga, was eventually caught. A videotape of this car chase (which suggests
Uranga committed the crimes of evading arrest, see Tex. Penal Code Ann. § 38.04(b)(1) (Vernon
2003), and criminal mischief, see Tex. Penal Code Ann. § 28.03 (Vernon Supp. 2007), was
admitted as evidence of an extraneous offense and shown to the jury during Uranga's punishment
trial in this case. 
2. In Sneed v. State, 209 S.W.3d 782, 787 (Tex. App.--Texarkana 2006, pet. ref'd), this Court
recommended a statutory change to allow jurors to be replaced with alternates in more situations,
and thereby avoid challenges of the type that has been raised in this case. In response to our
suggestion, effective September 1, 2007, Article 33.011(b) of the Texas Code of Criminal Procedure
was amended to broaden the situations in which an alternate juror may be seated. See Tex. Code
Crim. Proc. Ann. art. 33.011(b) (Vernon Supp. 2007). No longer is it essential to find that the
original juror has become unable to continue serving or is disqualified from continued service. In
this case, an alternate juror might have been used if one had been available. Nothing in this record
suggests, however, that any alternate juror was available to the trial court. Trial courts may find that
having an alternate juror in many, or all, cases could prove procedurally and fiscally beneficial.
3. At best, the record suggests Uranga's criminal mischief offense resulted in less than $500.00
of damage to the at-issue juror's property. Given such a modicum of damage, Uranga's offense was
most likely either a class B misdemeanor (punishable by no more than a $2,000.00 fine, six months
in jail, or both a fine and jail) or a class C misdemeanor (punishable by a fine not to exceed $500.00). 
See Tex. Penal Code Ann. § 28.03(b)(1), (2) (distinguishing level of misdemeanor crime based on
pecuniary loss by victim), § 12.22 (class B misdemeanor punishment), § 12.23 (Vernon 2003) (class
C misdemeanor punishment).
4. Moreover, the trial court expressly instructed the juror to "not let it [the extraneous offense]
influence you [the juror] in any way" and to "not share that experience with any of the other jury
members until after we get through." The juror promised he would abide by the trial court's
instructions. Uranga objected to allowing the punishment trial to continue with the same jury as it
was then constituted. But Uranga conceded the damage done to the juror's yard was "minimal." 
5. Our holding is based on the limited facts and procedural posture of this case. We do not
address whether a different conclusion would be warranted if the extraneous offense at issue were
more serious than a marginal misdemeanor case. See, e.g., Howard, 982 S.W.2d at 538-39 (trial
court abused discretion by denying mistrial motion when juror was stepmother of victim in
extraneous child rape case).
6. Uranga had originally been indicted for robbery. See Tex. Penal Code Ann. § 29.02
(Vernon 2003). The jury found him guilty of the lesser-included offense of theft. 
7. We specifically note that theft is a crime of moral turpitude. Bryant v. State, 997 S.W.2d
673, 677 (Tex. App.--Texarkana 1999, no pet.); Ludwig v. State, 969 S.W.2d 22, 28 (Tex.
App.--Fort Worth 1998, pet. ref'd); see also Tex. R. Evid. 609(a) (impeachment by evidence of
conviction of crime of moral turpitude). Juries often will discount the testimony of someone shown
to have been convicted of a crime of moral turpitude. See Cross v. State, 586 S.W.2d 478, 481 (Tex.
Crim. App. 1979).
8. Uranga has argued on appeal that the evidence is legally and factually insufficient because
the State's indictment alleged he possessed more than one gram but less than four grams of narcotics,
but the State did not attempt to prove at trial that the 3.29 grams of methamphetamine did not
include any adulterants or dilutants. The Texas Legislature amended the Controlled Substances Act
in 1997 to expand the statutory definition of "controlled substance" to include not only "pure"
narcotics, but to allow prosecution using aggregated weights that include adulterants and dilutants. 
See Tex. Health & Safety Code Ann. § 481.002(5) (Vernon Supp. 2007). As such, Uranga's
claim that the State may not rely on testimony about an aggregated weight--a measure that includes
amounts for both pure narcotics and any accompanying additives that otherwise "cuts" or dilutes the
purity of the drug--has been rendered meritless by virtue of the decade-old change in the underlying
statute.