*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROSS COUNTY WATER COMPANY, INC.,
              *Plaintiff-Appellee,*

              *v.*                                        No. 10-3422

CITY OF CHILLICOTHE,
              *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 08-00735—Michael H. Watson, District Judge.

Argued: July 29, 2011

Decided and Filed: November 30, 2011

Before: GIBBONS, STRANCH, and ROTH, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Garry E. Hunter, GARRY E. HUNTER LAW OFFICES, INC., LPA, Athens, Ohio, for Appellant. Dennis M. O'Toole, STUMPHAUZER, O'TOOLE, McLAUGHLIN, McGLAMERY & LOUGHMAN CO., LPA, Sheffield Village, Ohio, for Appellee. **ON BRIEF:** Garry E. Hunter, GARRY E. HUNTER LAW OFFICES, INC., LPA, Athens, Ohio, for Appellant. Dennis M. O'Toole, Matthew A. Dooley, STUMPHAUZER, O'TOOLE, McLAUGHLIN, McGLAMERY & LOUGHMAN CO., LPA, Sheffield Village, Ohio, for Appellee.

---

[*]The Honorable Jane R. Roth, Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.

---

**OPINION**

---

JANE ROTH, Circuit Judge.  This appeal involves a dispute between the Ross County Water Company (RCWC) and the City of Chillicothe.  Chillicothe appeals the Southern District of Ohio's Order granting RCWC's motion for summary judgment and denying Chillicothe's cross-motion for summary judgment.  Chillicothe contends the district court erred in holding that (1) RCWC is entitled to protection under 7 U.S.C. § 1926(b), (2) RCWC did not violate the doctrine of unclean hands, (3) the Tenth Amendment has not been violated as applied to the facts of this case, and (4) RCWC was entitled to attorneys' fees.  For the reasons expressed below, we affirm the judgment of the district court.

## I.  Background

### A.     *Parties*

RCWC is a non-profit, member-owned, water company incorporated in 1970 under Ohio Revised Code § 1702 *et seq.* to provide safe and potable water service to the rural areas of Ross County, Ohio.  Its members are limited to those who are the record owners of the property served by the water company and to whom the company's board of trustees has issued a certificate of membership. RCWC serves nearly 13,000 residential and business customers through approximately one thousand miles of pipeline. To finance the construction, maintenance, and extension of its water works system, RCWC borrowed nearly $10.6 million from the United States Department of Agriculture.

Chillicothe is a statutory city governed by the Ohio Constitution and organized pursuant to Ohio Revised Code Title 7.

**B.**      *The Disputed Area*

The disputed area is located in Green Township, an unincorporated area of Ross County approximately two miles north of Chillicothe's municipal boundaries. The area's western boundary is marked by Route 23, with the 207 Connector at its northern perimeter, Classic Brands at its southern perimeter, and properties adjacent to Hospital Road at its eastern perimeter. Delano Road runs east to west, bisecting the disputed area. Six parcels of land are either within or adjacent to the disputed property: Classic Brands, Adena Medical Center, an abandoned freight company, the Dr. Cosenza Property, the Warner Property, and the Cloverleaf Property. Classic Brands is located at the southernmost boundary of the disputed area. Chillicothe provides water service to Classic Brands; RCWC does not – nor has it ever intended to – provide water service to Classic Brands. Adena Medical Center is located immediately south of Classic Brands. Chillicothe provides water service to Adena Medical Center; RCWC does not – nor has it ever intended to – provide water service to Adena Medical Center. An abandoned freight company is located within the disputed area. It is adjacent to and immediately north of Classic Brands. The Dr. Cosenza Property, also located within the disputed area, is immediately north of the abandoned freight company. Although it is bisected by Route 23 and, therefore, lies on both the eastern and western sides of the road, the Warner Property is identified in county records as one parcel of land. This 72-plus acre property runs south to north along Hospital Road to Delano Road. RCWC has provided water service to the western side of the Warner Property since the mid-1970's. It has not, however, provided water service to the eastern side of the property, which is located within the disputed area. East of Hospital Road and north of Delano Road is the Cloverleaf Property. The Cloverleaf Development Corporation (Cloverleaf) purchased a portion of this property from Tecumseh Mobile Home Park (Tecumseh), a former customer of RCWC. After acquiring the land, Cloverleaf granted RCWC an easement in February 2003 to move an existing water tap to a new location, further north along Hospital Road, on the property.

C.     ***Waterlines***

1.     *RCWC's Waterlines*

In 1974, RCWC installed a ten-inch water pipe, or "waterline," running east to west slightly north of Delano Road. This line bisects the disputed area. The ten-inch line enabled RCWC to provide water service to Tecumseh. On November 8, 2000, Tecumseh applied for water service and granted RCWC easements to install additional waterlines on the property. In 2003, Cloverleaf purchased the Tecumseh property and subsequently entered into a water service agreement with RCWC, whereby RCWC would supply water to additional Cloverleaf properties running north of Delano Road along Hospital Road approximately 1,500 feet. Cloverleaf also granted RCWC easement rights to install a sixteen-inch waterline alongside the ten-inch line to serve as a backup line, as well as a future transmission line intended to run north-south along the proposed Hospital Road north of Delano Road. The sixteen-inch line was installed in 2003.

In addition to the Delano Road line, RCWC constructed a six-inch waterline on the west side of Route 23 in 1975. Consistent with plans developed in the mid-1970s, this waterline enabled RCWC to provide water service to properties on the east side of Route 23 by boring underneath the highway. This line serviced an abandoned freight company, the Dr. Cosenza Property, and the Warner Property until an eight-inch line running north-south from Delano Road along Hospital Road to just north of Classic Brands was installed by RCWC in June 2008 to loop its distribution system. Given the prospect of boring underneath the highway multiple times to meet growing customer demand on the east side of Route 23, RCWC determined it would be more economical to install this eight-inch line on the east side of Route 23.

On July 16, 2008, Cloverleaf entered into a new water provision agreement with RCWC and granted the association another easement to install waterlines through a parcel of its property located at the northernmost portion of the disputed area. RCWC immediately began constructing an eight-inch waterline at the intersection of Delano and Hospital Roads in a south-north direction to connect to the existing line at the northernmost point of the Route 207 Connector. The District Court ordered RCWC to

temporarily cease construction and tapping of this line in August 2008, but later permitted RCWC to continue its work on the line, which has since been completed.

### 2.      *Chillicothe's Waterlines*

Chillicothe maintains waterlines that serve Adena Medical Center and Classic Brands. Prior to 2008, Chillicothe's lines ended at the northernmost point of the Classic Brands property. In April 2008, Chillicothe passed a city ordinance approving plans to develop waterlines from Classic Brands to an area north of Delano Road. Chillicothe received approval from the Ohio Environmental Protection Agency to extend its waterline 1,500 feet north of Delano Road. Chillicothe began construction in August 2008, but RCWC obtained a preliminary injunction in the District Court, requiring Chillicothe to halt construction. According to RCWC, the complete construction of this line would render maintenance and repair of the RCWC line virtually impossible. The District Court then permitted Chillicothe to complete the installation of a line directly in front of Classic Brands and an east-west line just north of Classic Brands to maintain its service to Adena Medical Center.

### D.      *Relevant Legal Documents*

RCWC offers two legal documents to support its claim that it is entitled to protection under 7 U.S.C. § 1926(b). It asserts that these legal documents informed, if not dictated, its business outlook and provided the legal basis for it to borrow millions of dollars from the United States Department of Agriculture in order to install and maintain a significant waterline network. The first legal document is a purported Water Service Agreement between RCWC and Chillicothe dated June 29, 1971 (Contract). The Contract requires Chillicothe to provide water services to Adena Medical Center and Classic Brands and obligates RCWC to provide water services to the remaining unincorporated areas of Ross County until they are annexed by Chillicothe. Chillicothe challenges the authenticity of this document and avers that its city council never authorized the mayor to execute the Contract. Chillicothe also cites an article from the *Chillicothe Gazette* reporting the purported rescission of the Contract because it was never approved by the city council. Despite Chillicothe's claim that this agreement was

unauthorized, it has been adhered to for approximately 35 years, and there is no evidence that a lawsuit was ever initiated to contest the Contract.

The second document which RCWC offers is a Resolution of the Board of Ross County Commissioners dated February 14, 1972. This Resolution granted RCWC easement rights to lay waterlines throughout Ross County. It also acknowledged that RCWC's formation "eliminated the necessity of this Board of Commissioners" to create "a water district" and provide "residents with adequate water, which would have required [Ross County] to go into indebtedness." It was for this reason that Ross County "gave an easement granting to [RCWC] the right to lay its water lines within all necessary road rights-of-way within Ross County."

RCWC asserts that it relied upon these two documents when it incurred indebtedness to install and maintain its waterline network.

### E.     *Procedural History*

In August 2008, RCWC filed this lawsuit against Chillicothe to halt its construction of a waterline in the disputed area. Before the District Court, RCWC sought a declaration that it is entitled to 7 U.S.C. § 1926(b) protection and that Chillicothe cannot curtail RCWC's service by providing water service to the disputed area. RCWC also sought to enjoin Chillicothe from taking any further action to supply water to the disputed area.

Chillicothe counterclaimed and sought a declaration that RCWC is not entitled to § 1926(b)'s protections, that Chillicothe enjoys the exclusive rights to provide water to the disputed area, and that RCWC shall remove its waterlines from the disputed area. Chillicothe also sought to permanently enjoin RCWC from taking any further action to supply water to the disputed area.

After the close of discovery, the parties filed cross-motions for summary judgment. The District Court held that RCWC is entitled to the protections afforded by 7 U.S.C. § 1926(b) and enjoined Chillicothe from taking any further action to supply water to the disputed area. Chillicothe filed the instant appeal.

## II.  Discussion

### A.      *Jurisdiction and Standard of Review*

We have jurisdiction under 28 U.S.C. § 1291.  Jurisdiction was proper in the district court under 28 U.S.C. § 1331.

This Court reviews a district court's grant of summary judgment *de novo*. *Vill. of Grafton v. Rural Lorain Cnty. Water Auth.*, 419 F.3d 562, 565 (6th Cir. 2005) (citing *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 704 (6th Cir. 2003)).  "[W]hen an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." *Id.* (internal quotations omitted).  When based on purely legal grounds, the denial of summary judgment is also reviewed *de novo*. *Id.* Summary judgment is appropriate when the moving party demonstrates an absence of a genuine issue of material fact and that it is entitled to judgment a matter of law. *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996); Fed. R. Civ. P. 56(a).

### B.      *7 U.S.C. § 1926(b)*

Congress enacted the Agricultural Act of 1961 (Act) to "preserve and protect rural farm life." *Le-Ax Water Dist.*, 346 F.3d at 704.  One provision of this statute, codified at 7 U.S.C. § 1926(a), granted the Secretary of Agriculture authority to "'extend loans to certain associations providing water service . . . to rural residents.'" *Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233 (quoting *Jennings Water, Inc. v. City of North Vernon,* 895 F.2d 311, 314-15 (7th Cir. 1989)).  Another provision of the statute, codified at 7 U.S.C. § 1926(b), was enacted to protect the loan recipients from certain aspects of competition. *Le-Ax Water Dist.*, 346 F.3d at 704; *see Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233 (noting that the purpose of § 1926(b) was to "encourage rural water development by expanding the number of potential users and to safeguard the financial viability of rural associations and [Rural Economic and Community Development Service (RECDS)] loans").  Section 1926(b) provides:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan[.]

7 U.S.C. § 1926(b).

This Court has repeatedly interpreted this provision as preventing "local governments from expanding into a rural water association's area and stealing its customers[.]" *Le-Ax Water Dist.*, 346 F.3d at 705; *see Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233 ("The service provided . . . through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body . . . during the term of such loan"). Therefore, § 1926(b) "should be given a liberal interpretation that protects rural water associations indebted to the [RECDS] from municipal encroachment." *Vill. of Grafton*, 419 F.3d at 566-67 (quoted case omitted). The statute's legislative history provides further support for this interpretation. As the Court in *Le-Ax* noted,

> the legislative history states that the statutory provision was intended to protect the territory served by such an association facility against [other] competitive facilities such as local governments, as otherwise rural water service might be threatened by the expansion of the boundaries of municipal and other public bodies into an area served by the rural system.

*Le-Ax Water Dist.*, 346 F.3d at 705 (citing S. Rep. No. 87-566, at 67 (1962)) (internal quotations omitted). In other words, § 1926(b) protects rural water associations from a municipality's effort to provide water service to the rural water association's customers or to potential customers located within the rural water association's boundaries. *See City of Madison v. Bear Creek Water Ass'n*, 816 F.2d 1057, 1060 (5th Cir. 1987).

To establish that it is entitled to protection under § 1926(b), RCWC must show that "(1) it is an 'association' within the meaning of the Act; (2) it has a qualifying outstanding [RECDS] loan obligation; and (3) it has provided or made service available in the disputed area." *Lexington-South Elkhorn Water Dist.*, 93 F.3d at 234. To satisfy the third and final prong, RCWC must demonstrate it has "pipes in the ground" that

provide service within or adjacent to the disputed area, *id.* at 233, 237, and that it has the legal right under state law to serve the disputed area. *Vill. of Grafton*, 419 F.3d at 566. If RCWC establishes these facts, it is entitled to § 1926(b)'s protection. The second element is not in dispute. The parties agree that RCWC has a qualifying outstanding RECDS loan obligation.

1.    *Whether RCWC is an "association" under § 1926(b)*

Chillicothe challenges the District Court's determination that RCWC is an association within the meaning of the Act. Section 1926(a)(1) defines the entities covered by the Act and provides, in relevant part, that:

> [t]he Secretary [of Agriculture] is also authorized to make or insure loans to associations, including corporations not operated for profit, Indian tribes on Federal and State reservations and *other* federally recognized Indian tribes, and public and quasi-public agencies. . . . to provide for . . . the conservation, development, use, and control of water[.]

7 U.S.C. § 1926(a)(1) (emphasis added). Although Chillicothe concedes that RCWC is a not-for-profit corporation organized under Ohio Revised Code § 1702.01 *et seq.* and that § 1926(b) covers not-for-profit corporations, it contends that such corporations must also qualify as a "quasi-public agency." In support of this interpretation, Chillicothe argues that prior to 1972, the term "other" was not included in the text of § 1926(a)(1).[1] Therefore, according to Chillicothe, when Congress added the term "other," it intended to limit the scope of the Act to public agencies or quasi-public not-for-profit corporations.

We do not agree with Chillicothe's interpretation of § 1926(a)(1). Not only does Chillicothe fail to cite any authority to support its position, but the plain language of the subsection clearly indicates that a non-profit corporation does not need to qualify as a quasi-public agency in order to receive the protections of § 1926(b). To interpret a statute's plain language, courts should give the statute's words "their ordinary,

---

[1] Prior to amendment, the subsection read "(a) [t]he Secretary also is authorized to make or insure loans to associations, including corporations not operated for profit and public and quasi-public agencies." (Appellant Br. at 14); 7 U.S.C. § 1926(a)(1) (1964) (amended 1972).

contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (internal quotations omitted). Turning to § 1926(a)(1), immediately following the term "associations" is the word "including," a participle that "typically indicates a partial list." Black's Law Dictionary (9th ed. 2009). Thus, the phrases following "including," *i.e.*, "corporations not operated for profit, Indian tribes on Federal and State reservations and other federally recognized Indian tribes, and public and quasi-public agencies," are intended to serve as examples of the types of entities that constitute associations. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 234 (holding that because a municipality is a public agency, it qualifies as an "association" for purposes of § 1926(a)(1)). This is the most logical interpretation of § 1926(a)(1). As it presently reads, the statute's plain language states, without limitation, that an "association" includes "corporations not operated for profit." 7 U.S.C. § 1926(a)(1). The subsection does not expressly limit the types of entities that constitute "corporations not operated for profit," nor does it link "corporations not operated for profit" with the remaining "other" agencies. If Congress intended such a linkage, it would have phrased the statute differently.

Moreover, no court applying § 1926 has ever imposed a "quasi-public" agency requirement. *See, e.g., Moongate Water Co. v. Dona Ana Mut. Domestic Water Consumers Ass'n*, 420 F.3d 1082, 1084 (10th Cir. 2005) (observing that "Congress amended the Consolidated Farm and Rural Development Act [] to allow *nonprofit water associations* to borrow federal funds for 'the conservation, development, use, and control of water . . . primarily serving . . . rural residents.'"); *Jennings Water, Inc.*, 895 F.2d at 312 (noting that a not-for-profit company constituted an association under § 1926(a)(1)). Thus, the District Court correctly determined that RCWC qualifies as an "association" under § 1926(b).[2]

_____

[2]In its brief, Chillicothe also argues that RCWC is not an association under the Act because RCWC is not a state defined rural water district. This argument, however, conflates the question of whether a not-for-profit corporation is an association with the issue of whether the association has a legal right to serve the disputed area. This Court has never held that a non-profit corporation must also be a state defined rural water district to qualify as an association under § 1926(a)(1). Therefore, to the extent Chillicothe's argument is relevant to whether RCWC qualifies as an association, the Court finds it meritless.

2.     *Whether RCWC has established that it has provided or made water service available in the disputed area*

This Court applies a two-prong test to determine whether an association has made water service available to a disputed area. *Vill. of Grafton*, 419 F.3d at 566. "[A] key factor in determining whether a water district has made water service available is the proximity of the water district's distribution lines to areas in dispute." *Lexington-South Elkhorn Water Dist.*, 93 F.3d at 235. Thus, courts should first consider whether the association has "pipes in the ground." *Le-Ax Water Dist.*, 346 F.3d at 706. This requires the association to have water pipes either within or adjacent to the disputed area before the allegedly encroaching association begins providing water service to customers in the disputed area. *Lexington-South Elkhorn Water Dist.*, 93 F.3d at 237 ("If an association does not already have service in existence, water lines must either be within or adjacent to the property claimed to be protected by Section 1926(b) prior to the time an allegedly encroaching association begins providing service in order to be eligible for Section 1926(b) protection."). The association seeking § 1926(b) protection must also be capable of providing service to the disputed area within a reasonable time after a request for service occurs. *See Vill. of Grafton*, 419 F.3d at 566 (citing *Lexington-South Elkhorn Water Dist.*, 93 F.3d at 237). Once the association satisfies the "pipes in the ground test," the court should then determine whether the rural water association has the legal right under state law to provide water to the disputed area. *Id.*

a. *Pipes in the Ground*

According to Chillicothe, RCWC does not have "pipes in the ground" because it (1) "did not have the physical ability to service the disputed area at the time the lawsuit was filed," and (2) did not have any customers in the disputed area. For the reasons discussed below, both arguments fail.

In March 2008, the Chillicothe City Council first discussed providing service to the disputed territory. For almost forty years prior to that discussion, however, RCWC had waterlines within or adjacent to the disputed area. RCWC installed a ten-inch waterline running east-west along Delano Road in 1974. This line, as well as the

sixteen-inch line installed in 2003, bisected the disputed area, and has provided water service to the Cloverleaf Property and its predecessor, Tecumseh, since it entered into a Water Users' Agreement with RCWC on November 8, 2000. After purchasing Tecumseh, Cloverleaf continued to obtain its water from RCWC.

RCWC also installed a north-south six-inch line on the west side of Route 23 in 1975, which has provided water service to the Warner Property since the mid-1970s. This line ends at the emergency connection provided by RCWC for Chillicothe. RCWC always intended that this six-inch line serve properties on the east side of Route 23. In order to provide such service, RCWC planned to bore underneath Route 23, a common process that does not disturb the road above. Because boring underneath the road is an expensive endeavor, RCWC constructed, in 2008, an eight-inch line on the east side of Route 23. This line provided another water source for several properties, including the Warner Property, the parcel owned by Dr. Cosenza, and an abandoned freight company.

These undisputed facts demonstrate that RCWC had "pipes in the ground" within and adjacent to the disputed area before Chillicothe commenced its installation of waterlines in or around the disputed area. Although RCWC installed an eight-inch waterline extension running south along Hospital Road, and another eight-inch line extension from the intersection of Hospital Road and Delano Road running north to a line at the northern-most point of the Route 207 Connector, the record is clear that the purpose of these lines was not to increase RCWC's service area, but rather to upgrade its system that already served the disputed area. With the additional waterlines, RCWC was able to loop its system to provide backup service and better control its water pressure. This made service more cost effective because the company did not need to bore under Route 23 to provide water to future customers on the eastern side of the road. Moreover, this business decision was consistent with the Department of Agriculture's interest in providing water to rural areas and ensuring repayment of federal debt. *Le-Ax Water Dist.*, 346 F.3d at 705 (§ 1926(b) protection "prevent[s] rural water costs from becoming prohibitively expensive to any particular user, to develop a system providing

fresh and clean water to rural households, and to protect the federal government as insurer of the loan.").

The record is also clear that the 1974, 1975, and 2003 waterlines were sufficient to provide water to new customers within a reasonable time after their request for service. Not only does Chillicothe fail to provide any contrary evidence that RCWC did not have sufficient pressure or capacity to serve the disputed area, but it is also undisputed that the pressure in RCWC's waterlines is approximately 150 pounds per square inch, which is more than sufficient to provide adequate service to the disputed area. Furthermore, an incident in 1998 reveals that the line is more than capable of providing service to the disputed area when requested. At that time, RCWC utilized its 1974 six-inch line that ran on the east side of Route 23 to provide Chillicothe with emergency water service for several weeks. Because RCWC could provide Chillicothe with water, the incident demonstrates that the pressure and capacity is more than sufficient to sustain service to additional customers in the disputed area.

Chillicothe additionally argues that RCWC does not qualify for § 1926(b) protection because it did not have any customers in the disputed area at the time it filed its lawsuit. This Court's case law soundly rejects this precise argument. *See Le-Ax Water Dist.*, 346 F.3d at 707 ("To argue, as Athens does, that water service must be available immediately (evidently in the sense that someone at University Estates must be able to go over to the faucet and turn on the water), would be to ignore our statement in *Lexington-South Elkhorn* that the 'made available' requirement is satisfied not only when the pipes are 'within,' but also when they are merely 'adjacent to' the property"). The panel in *Le-Ax* opined that the association seeking § 1926(b) protection must have "'adequate facilities within or adjacent to the area to provide service to the area *within a reasonable time after a request for service is made.*'" *Id.* (quoting *Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1203 (10th Cir. 1999) (emphasis added)). It did not require the association to have active customers in the disputed area. Rather, the language suggests that future customers are relevant. RCWC's waterline infrastructure traverses the disputed area and is sufficient to provide

service to new customers within a reasonable timeframe.  Accordingly, no reasonable jury could infer that RCWC did not have "adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made."  *Le-Ax Water Dist.*, 346 F.3d at 706.

### b.  *State-Law Rights*

The second prong of this two-part test requires the Court to determine whether RCWC has a legal right under state law to serve the disputed area.  RCWC's legal right to serve the disputed area stems from its regulation by entities within the State of Ohio and its permission by the Ross County Board of Commissioners to construct waterlines.

It is undisputed that RCWC is regulated by the Ohio Environmental Protection Agency (Ohio EPA) and that it obtained approval from the Ohio EPA before installing its waterlines.  Thus, by sanctioning RCWC's waterline installation, the State of Ohio, at least implicitly, gave RCWC a legal right to serve the disputed area.  Additionally, the Ross County Board of Commissioners resolved in 1972 to give RCWC a blanket easement to construct waterlines throughout the unincorporated areas of Ross County.  This resolution provides further evidence that RCWC had a legal right to serve the disputed area.

### C.  *Sword v. Shield*

Chillicothe's final argument is that § 1926(b)'s protection is unavailable to RCWC because it utilizes the statute as a sword to invade rather than a shield to defend against an invasion.  This argument is without merit.  Chillicothe misunderstands the purpose of the "sword versus shield" distinction drawn in *Le-Ax* and ignores a key difference between this case and *Le-Ax*.  In *Le-Ax*, this Court reasoned that an association "cannot properly invoke the protections of 7 U.S.C. § 1926(b) . . . [where it] is not seeking to use the statute to protect its users or territory from municipal incursion . . . [, but] instead is seeking to use the statute to foist an incursion of its own on users outside of its boundary that it has never served or made agreements to serve."  *Le-Ax Water Dist.,* 346 F.3d at 707.  As this language suggests, the *Le-Ax* panel explicitly

limited its holding to the "unique facts," *id.*, where a state has "defined the boundaries of its water districts or associations" and the association sought to serve an area outside its "actual or operative services area" or, as is important here, outside its state-defined boundaries, *id.* at 710. Consequently, *Le-Ax* is not applicable here because RCWC was established as a non-profit and is without state-defined geographical boundaries. *See id.* at 710 (noting that because this case dealt with water districts that were defined by state law, the Court did not address the "case where the state has not defined the boundaries of its water districts or associations"). Moreover, as discussed above, RCWC had waterlines within or adjacent to the disputed area before Chillicothe began its encroachment. Therefore, RCWC's action is consistent with the purpose of § 1926, which is to foster rural water development and protect the federal government as the insurer of the loans used to construct the requisite infrastructure. Thus, RCWC is using § 1926(b)'s protection as a shield to prevent Chillicothe from encroaching on its existing service territory, not as a sword to expel Chillicothe from unserved territory RCWC hopes to annex.[3]

### D.    *Attorneys' fees*

Chillicothe contends the district court erred in awarding RCWC attorneys' fees. This argument is premature. The district court permitted RCWC to file a motion for costs and attorneys' fees. The court has neither ruled on RCWC's motion, nor entered a judgment awarding costs and attorneys' fees. Therefore, this issue is not ripe and we will not address it.

### III.  Conclusion

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment and of a declaratory judgment to RCWC.

---

[3]Chillicothe also asserts that summary judgment was inappropriate because (1) RCWC violated the doctrine of unclean hands and (2) the Tenth Amendment is violated as applied to the facts of this case. After considering these arguments, this Court concludes they are meritless and will not address them further.