In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2942

WASHINGTON COUNTY WATER COMPANY, INC.,

*Plaintiff-Appellant,*

*v.*

CITY OF SPARTA, ILLINOIS,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Illinois.
No. 20-cv-1052 — **Nancy J. Rosenstengel**, *Chief Judge.*

_____

ARGUED JUNE 2, 2023 — DECIDED AUGUST 8, 2023

_____

Before FLAUM, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* The Agriculture Act of 1961 authorized the United States Department of Agriculture ("USDA") to provide loans to rural water associations to decrease the cost and ensure an adequate supply of safe water for farmers and other rural residents. To ensure that these associations could repay their loans, Congress enacted 7 U.S.C. § 1926(b), which prohibits municipalities and others from selling water in an area that a USDA-indebted rural water association has

"provided or made available" its service. In order to be entitled to protection under § 1926(b), the rural water association must have the physical capability to provide service to the disputed area and a legal right to do so under state law.

Washington County Water Company ("WCWC") is a rural water association that sells potable water to several counties in southern Illinois. The Village of Coulterville is adjacent to these counties. In 2019, due to the deteriorating state of its water treatment facility, Coulterville explored the possibility of buying water from either WCWC or the City of Sparta. Coulterville ultimately decided to buy water from Sparta because it was not convinced that WCWC could provide enough water to satisfy its residents' demand. When WCWC learned of this decision, it filed a complaint in federal district court alleging that § 1926(b) prohibited Sparta from selling water to Coulterville because WCWC had made its service available to Coulterville. The district court granted summary judgment in favor of Sparta, holding that WCWC was not entitled to § 1926(b) protection because it did not have a legal right to provide water to Coulterville under Illinois state law.

## I. Background

### A. Statutory Framework

As part of the Agricultural Act of 1961, Congress passed the Consolidated Farm and Rural Development Act, which, among other things, promotes the "conservation, development, use, and control of water" to help farmers and other rural residents obtain access to affordable and adequate quantities of safe water. 7 U.S.C. §§ 1921, 1926(a)(1). It does this by

authorizing the USDA[1] to provide loans to rural water associations or utilities "to finance specific projects for works for the development, storage, treatment, purification, or distribution of water …." § 1926(a)(2)(A)(i). Congress passed § 1926(b) of the Act to protect these USDA-indebted associations from certain forms of competition and ensure that they could repay their loans.

Under § 1926(b),

> [t]he service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

This "statute explicitly prohibits municipal encroachment on a rural water association's service area …." *Jennings Water, Inc., v. City of North Vernon*, 895 F.2d 311, 314 (7th Cir. 1989). "Congress intended a broad reading of section 1926(b)." *Id.* at 315. "[S]ection 1926(b) does not limit itself strictly to the rural association territory *per se*, but rather, extends the

---

[1] "Prior to 1994, the loans relevant to 7 U.S.C. § 1926[] were operated by the Farmers Home Administration (FmHA). The USDA now operates the loan and guarantee program through the Rural Utility Services." *Garrett Dev., LLC v. Deer Creek Water Corp.*, No. 21-6105, 2022 WL 12184048, at *1 n.1 (10th Cir. Oct. 21, 2022) (citations omitted).

association's protection against competition also to those to whom service is 'provided or made available' through a private intermediary." *Id.* at 318.

Although the Seventh Circuit has not explicitly stated how to determine when an association has "provided or made available" service to a certain area, other circuits apply a two-pronged test. *See, e.g.*, *Green Valley Special Util. Dist. v. City of Shertz*, 969 F.3d 460, 476–77 (5th Cir. 2020) (en banc) ("Every other circuit to consider § 1926(b) has adopted some variation of the 'physical capability' test.").

The first prong, referred to as the "pipes in the ground" prong, asks whether the association has "water pipes either within or adjacent to the disputed area before the allegedly encroaching association begins providing service to customers in the disputed area." *Ross Cnty. Water Co. v. City of Chillicothe*, 666 F.3d 391, 399 (6th Cir. 2011) (citation omitted). "The association seeking § 1926(b) protection must also be capable of providing service to the disputed area within a reasonable time after a request for service occurs." *Id.* (citation omitted). The second prong asks whether the association has the "legal right under state law to provide water to the disputed area." *Id.* (citation omitted).[2]

---

[2] *See also Green Valley*, 969 F.3d at 477 ("[W]e hold that a utility must show that it has (1) adequate facilities to provide service to the area within a reasonable time after a request for service is made and (2) the legal right to provide service."); *Chesapeake Ranch Water Co. v. Bd. of Comm'rs*, 401 F.3d 274, 281 (4th Cir. 2005) ("For purposes of § 1926(b), to prove that it has provided or made available service, a water association must demonstrate that (1) it is physically capable of serving the area in dispute, (2) it has the legal right under state law to do so, and (3) the disputed area is within the geographic boundaries of the association's existing franchise area.").

## B. The Parties

WCWC is a rural non-profit association that provides potable water to customers in southern Illinois. It serves approximately 4,765 customers across St. Clair, Washington, Jefferson, Randolph, Jackson, and Franklin counties. Since 1980, WCWC has been continuously indebted to the USDA for loans used to build its distribution system. It is licensed by the Illinois Environmental Protection Agency ("IEPA") and is in good standing.

Water associations can obtain safe, potable water in two ways: They can operate their own treatment plants, or they can purchase already treated water. WCWC does the latter— it purchases potable water from several suppliers and delivers that water to its customers through its distribution system. Specifically, WCWC has contracts with the Kaskaskia Water District for 25 million gallons/month; the City of Nashville, Illinois for 432,000 gallons/day; and the Rend Lake Conservatory for 450,000 gallons/day. WCWC also has a contract with Kinkaid-Reed's Creek Conservatory to purchase water, but, as the district court noted, "[t]he Kinkaid District-WCWC system is essentially a 'closed loop,' and WCWC has never taken water sold to it under the Kinkaid contract and distributed it through its water distribution system."

---

Some courts also require "an association to prove that it has provided or made available service by demonstrating that it has a duty (not merely a right) under state law to provide service to the disputed area." *Chesapeake Ranch*, 401 F.3d at 279 (citations omitted). But most courts have rejected that an association must have a legal duty to provide service to be protected by § 1926(b), *id.*, and neither party here claims that a legal duty is required for § 1926(b) to apply.

In addition to the primary contract with Kaskaskia, WCWC also had a secondary contract to provide water to the Prairie State Generation Company (the "Prairie State contract"). As part of the agreement between WCWC, Prairie State, and Kaskaskia, WCWC constructed a direct line from Kaskaskia to Prairie State. Under the contract, WCWC was entitled to buy, and Prairie State was entitled to receive, up to 300,000 gallons/day from Kaskaskia. The Prairie State contract also permitted WCWC to send excess water, not used by Prairie State, to its own distribution system. This contract, however, expired in 2021 without renewal.

The Village of Coulterville is located in southern Illinois, adjacent to counties that WCWC serves. Coulterville operates its own water treatment facility and provides water to its residents, with one exception: Coulterville does not provide service to a single resident who lives one meter north of the Coulterville village line. The easiest way to provide this customer with service was to connect them to WCWC's system. So, pursuant to a contract, Coulterville pays WCWC for the water that it sells to this one customer. WCWC does not provide water service to anyone else in Coulterville. But WCWC has previously communicated to Coulterville that WCWC has service available if Coulterville ever needed additional or expanded water service.

Due to the age and condition of Coulterville's water treatment facility, it is nearing the end of its useful life. So, Coulterville hired HMG Engineers in 2019 to look into an alternative water source. HMG investigated the possibility of obtaining water from either WCWC or the City of Sparta. HMG ultimately recommended that Coulterville buy water from Sparta, finding that WCWC would not be able to commit to

providing enough water to satisfy Coulterville's customers' demand. Coulterville heeded this recommendation and sought water services from Sparta.

**C. Procedural History**

When WCWC learned that Coulterville was negotiating with Sparta, it sent letters through legal counsel to both Coulterville and Sparta, claiming to have a federally protected right to service Coulterville under 7 U.S.C. § 1926(b). When those efforts failed, WCWC filed a complaint alleging that Sparta was attempting to unlawfully curtail WCWC's federally protected service area. It sought a declaratory judgment and preliminary and permanent injunctions. Both parties retained experts to support their arguments—Harry Harman for Sparta and Lindsey Bowlin for WCWC. Bowlin opined that WCWC had the capacity to provide water service to Coulterville, and Harman said the opposite.

The district court held that WCWC was not entitled to § 1926(b) protection because it did not have a legal right under Illinois state law to provide service to Coulterville. Specifically, according to IEPA regulations, WCWC "must be designed to produce at least 20 percent greater than [its] maximum average daily demand …." Ill. Admin. Code tit 35, § 604.105(a). "When records are not available," as is the case here, "maximum demand must be calculated as 1.5 times the average daily usage." § 604.115(c).[3]

---

[3] Where daily records are available, "'Maximum Average Daily Demand' or 'Maximum Demand' means the highest average daily production over seven consecutive days." Ill. Admin. Code tit 35, § 601.105(a).

WCWC argued that "designed to produce" in § 604.105(a) referred to the amount of water it could distribute through its distribution system (its "pumping capacity"), not the amount of water it could purchase under its contracts (its "contractual capacity"). Sparta, in contrast, argued that "designed to produce" referred to a combination of WCWC's pumping and contractual capacities, because, if WCWC had contracts to purchase more water than it could pump through its systems, its pumping capacity would limit its contractual capacity (or vice versa).

The district court found that WCWC was unable to produce "20 percent greater than the maximum daily average" no matter which metric was used. Including Coulterville's demand, the court found that WCWC had a maximum average daily demand of 1,608,297 gallons/day, so after adding the required 20 percent reserve, WCWC needed to be "designed to produce" at least 1,929,956 gallons/day. The court then calculated WCWC's contractual capacity as 1,701,672 gallons/day, and its pumping capacity as 1,593,672 gallons/day. Accordingly, the court held that WCWC did not have the legal right to provide service to Coulterville—even ignoring other issues such as customary water loss due to leaks, both WCWC's pumping and contractual capacities were insufficient to produce its maximum average daily demand plus 20 percent. The district court did not address the "pipes in the ground" prong of the test because WCWC failed on the legal right prong. WCWC appealed, and we affirm.

## II. Discussion

On summary judgment, "[o]ur review is de novo. We view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Summary judgment is

appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022) (citations and internal quotation marks omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (citation omitted).

Under § 1926(b), Sparta is barred from selling water to Coulterville if: (1) WCWC is a USDA-indebted rural water association, and (2) WCWC has "provided or made available" service to Coulterville. *Jennings Water*, 895 F.2d at 314 (quoting § 1926(b)). There is no dispute that WCWC is an association within the meaning of the statute and is indebted to the USDA. Because all of WCWC's claims rest on it establishing protection under § 1926(b), we need only address the narrow question of whether § 1926(b) prohibits Sparta from providing water services to Coulterville because WCWC has "provided or made available" those services to Coulterville. Further, WCWC does not dispute the district court's finding that its current contract with Coulterville—to provide water service to a single resident just outside of Coulterville—is not sufficient to establish that WCWC currently provides services to Coulterville because "there is no connection between the customer's property and Coulterville's distribution system." Accordingly, we assume that WCWC has not "provided" services to Coulterville; the only issue here is whether WCWC has "made available" its services to Coulterville.

**A. Legal Right**

To receive protection under § 1926(b), WCWC must show that it "has a legal right under state law" to serve Coulterville. *Ross Cnty.*, 666 F.3d at 401. Courts have generally looked to state agency regulations to determine whether an association has a legal right to serve a disputed area. *See id.* ("RCWC's legal right to serve the disputed area stems from its regulations by entities within the State of Ohio …."). The relevant regulating agency under Illinois state law is the IEPA. Accordingly, WCWC can only survive summary judgment if it can establish a genuine factual dispute as to whether it is "designed to produce" at least 20 percent more than its maximum average daily demand (including Coulterville's demand), as required by IEPA regulations.

IEPA regulations provide no guidance on how to calculate WCWC's average daily demand, and the parties dispute the correct calculation. Although WCWC does not have records of its daily water usage, it does have records of monthly and yearly water usage, which the parties and the district court used in different ways to calculate WCWC's average daily demand. The district court calculated WCWC's average daily demand based on the records from 2018 alone; Bowlin, WCWC's expert, calculated an average daily demand for each year between 2018 and 2020; Sparta and its expert, Harman, calculated a single figure based on WCWC's average daily demand from 2016–2020; and WCWC did the same using its average daily demand from 2018–2020. The same was true for Coulterville; the parties disputed which years to use to calculate Coulterville's average daily demand. The parties then multiplied the average daily demand by 1.5 to determine the *maximum* average daily demand. *See* Ill. Admin. Code tit 35,

§ 604.115(c). After adding WCWC's and Coulterville's maximum average daily demands together, the parties' differing methods resulted in maximum average daily demands ranging from 1,556,645 gallons/day to 1,638,566 gallons/day.

We agree with WCWC that, for purposes of summary judgment, we must assume WCWC's calculation is correct based on the record before us. Viewing the evidence in the light most favorable to WCWC, the maximum average daily demand is the lowest number, which is WCWC's calculation of 1,556,645 gallons/day. Accordingly, we proceed under the assumption that WCWC must be "designed to produce" 20 percent more than this number, or 1,867,974 gallons/day, to comply with Illinois law and have a legal right to serve Coulterville.

### B. "Designed To Produce"

The next question is whether "designed to produce" refers to WCWC's pumping capacity or to its contractual capacity. The district court did not decide this issue because it found that both were insufficient under Illinois law. As far as we can tell, no circuit court has addressed this specific issue.

According to WCWC, "designed to produce" "applies to a system's design capacity, not its *existing* capacity." Because it does not have a treatment facility and instead purchases its water from others, WCWC argues that "designed to produce" means its pumping capacity, not its contractual capacity, and the district court erred by conflating these two metrics.

Sparta conceded at oral argument that if pumping capacity alone was the correct metric, then there is a material dispute sufficient to survive summary judgment. But Sparta argues that the correct metric is a combination of WCWC's

pumping and contractual capacities because, "[i]f a combination of pumps produces fewer gallons per day than the individual supplier can provide, the booster pumping stations become choke points limiting the supply to less than what the individual supplier could possibly provide." According to Bowlin, for example, the pump station connecting Nashville to WCWC can pump 284 gallons/minute, or 408,960 gallons/day. Under the contract with Nashville, however, WCWC is entitled to purchase 432,000 gallons/day. In other words, WCWC can buy more water from Nashville than it can pump. Thus, according to Sparta, WCWC's pumping capacity limits how much water it can "produce," no matter how much water WCWC is entitled to purchase. We agree with Sparta.

Ill. Admin. Code tit 15, § 604.105(a) provides that a "community water supply must be designed to produce at least 20 percent greater than the maximum average daily demand." "Community water supply" is defined as "a public water supply which serves or is intended to serve at least 15 service connections used by residents or regularly serves at least 25 residents." § 601.105(a). And, as the dissent notes, the definition "public water supply," in turn, is focused on the infrastructure "actually used or intended for use for the purpose of furnishing water for drinking or general domestic use." *Id.* "Community water supply," however, includes a water association like WCWC that does not operate its own water treatment facility. *See* 415 Ill. Comp. Stat. 45/5.1 ("'Class D community water supply' means any community water supply that has only pumpage, storage, or distribution facilities."); *see also* Ill. Admin. Code tit. 35, § 601.105(a) (defining "satellite supply" as "any community water supply that[] purchases all finished water from another community water supply…").

By its plain language, the requirements under § 604.105(a) apply to all community water supplies, including WCWC. And contrary to the dissent, we see nothing in § 604.105(a) (or elsewhere) limiting its scope to only pumping capacity, ignoring whether the water association can even obtain enough water to equal that capacity. Indeed, under WCWC's and the dissent's view, the meaning of "designed to produce" would change depending on the water association at issue—e.g., for those water associations with a treatment facility, it would refer to its ability to treat and distribute sufficient water; but for those associations without a treatment facility, it would refer only to its ability to distribute water. Nothing in the language of the regulation supports such an amorphous interpretation. Accordingly, we read "designed to produce" as referring to the water association's ability to furnish sufficient water to residents, whether it treats its own water or purchases it from others. For WCWC, this means we must look at both its contractual and pumping capacities.

The purpose behind the IEPA further supports this interpretation. The IEPA was created by Illinois's Environmental Protection Act, 415 Ill. Comp. Stat. 5/1, 5/3.105, which provides that,

> [t]he General Assembly finds that state supervision of public water supplies is necessary in order to protect the public from disease and *to assure an adequate supply of pure water for all beneficial uses*. It is the purpose of this Title to assure adequate protection of public water supplies.

415 Ill. Comp. Stat. 5/14 (emphasis added). The IEPA implemented the regulations at issue to effectuate this purpose.

Illinois's purpose of "assur[ing] an adequate supply of pure water for all beneficial uses" means we must look at WCWC's pumping capacity as limited by its contractual capacity. After all, WCWC cannot pump what it cannot buy. If we were to accept WCWC's argument that pumping capacity alone is the correct metric, then we would be holding that water utilities with systems that can pump enough water are entitled to § 1926(b) protection, even if they cannot purchase sufficient water to pump through those systems and meet demand.[4] Accordingly, to be entitled to protection under § 1926(b), WCWC must be able to purchase sufficient water under its contracts and also pump sufficient water through its system to distribute to its customers.

### 1. WCWC's Pumping Capacity[5]

Pumping capacity represents how much water WCWC's pumping stations can distribute through its system. WCWC states—and Sparta's expert, Harman, agrees—that its

---

[4] Conversely, a utility with sufficient contractual capacity but insufficient pumping capacity would not be "designed to produce" enough water to meet the requisite average daily demand.

[5] We reject Sparta's contention that WCWC waived the argument that "designed to produce" means pumping capacity because it failed to adequately raise this issue below. The district court ruled on this issue and found that, "even accepting WCWC's argument that the Court should look at its system's pumping capacity … rather than its contractual capacity, WCWC does not have a sufficient water supply to serve Coulterville." This ruling supports that WCWC raised this argument below. But even if it did not, the district court's ruling on the issue preserved it for appeal. *See Gerhartz v. Richert*, 779 F.3d 682, 686 (7th Cir. 2015) (holding that an untimely argument is preserved for appeal "if the district court exercises its discretion to consider the issue on the merits" (citation omitted)).

pumping stations are technically able to pump 1,992,960 gal-
lons/day. This number exceeds WCWC's maximum average
daily demand plus the required 20 percent reserve.

Sparta, however, argues that WCWC's actual pumping ca-
pacity is only 1,539,672 gallons/day—less than the requisite
1,867,974 gallons/day—because water under the Prairie State
contract is distributed to Prairie State using one of WCWC's
pumping stations, decreasing the amount of water that station
can pump through WCWC's system. The district court agreed
with Sparta and adopted its calculation.[6] But the Prairie State
contract expired in 2021 without being renewed. So, viewing
the evidence in the light most favorable to WCWC, that con-
tract is irrelevant to this analysis.

Sparta also claims WCWC's pumping capacity is even
lower because it, like all water associations, loses water due to
leaks and other issues. But even if we reduce WCWC's pump-
ing capacity by 5.6 percent based on the average amount of

---

[6] The district court erred by adopting Sparta's calculation. Even after
purporting to accept WCWC's claim that it has a technical pumping ca-
pacity of 1,992,960 gallons/day, the court adopted Sparta's number be-
cause it agreed with Sparta on the Prairie State contract issue. But Sparta's
expert, Harman, was initially provided with incorrect information and cal-
culated a technical pumping capacity of 1,812,000 gallons/day, then sub-
tracted from that number because he opined that WCWC had to use some
of its pumping capacity to pump water to Prairie State. After receiving the
correct information, Harman submitted a supplemental expert report
where he agreed with WCWC's calculation. If the court agreed with
Sparta on the Prairie State contract issue, it should have subtracted that
amount from 1,992,960 gallons/day, not adopted Sparta's number based
on Harman's initial calculation of a 1,812,000 gallon/day pumping capac-
ity. WCWC did not raise this issue, but the error is harmless because it
does not change the outcome.

water WCWC loses, WCWC's pumping capacity is 1,881,354 gallons/day, which is still more than the requisite 1,867,974 gallons/day.[7] Because there is at least a genuine dispute as to whether WCWC's pumping capacity exceeds its maximum average daily demand plus the 20 percent reserve, we move on to discuss its contractual capacity.

### 2. WCWC's Contractual Capacity

Contractual capacity represents the amount of water WCWC is entitled to purchase under contract from its suppliers. Here, WCWC has contracts to purchase 25 million gallons/month from Kaskaskia; 432,000 gallons/day from Nashville; and 450,000 gallons/day from Rend Lake.[8]

The parties dispute WCWC's contractual capacity. Bowlin, WCWC's expert, divided the amount of water available monthly from Kaskaskia by thirty to get the daily amount, then added this to the daily amounts available under the other two contracts to get a total contractual capacity of 1,715,333 gallons/day. Sparta and Harman challenge this calculation because not every month has thirty days. The district court agreed with Sparta and found that "WCWC can

---

[7] Harman noted that, although 5.6 percent is the average amount of water WCWC has lost to leaks and other issues, WCWC has lost as much as 40 percent of its water in a single month. WCWC claims that the district court's reliance on water loss is reversible error because "water loss" is not mentioned in the statute. But because the water loss issue does not change the outcome, any error was harmless.

[8] The parties agree that the other two contracts—the Kinkaid-Reed and Prairie State contracts—are irrelevant for calculating contractual capacity.

purchase 13,661 gallons per day *less* than Bowlin calculated—or 1,701,672 gallons."

Even accepting WCWC's calculation of 1,715,333 gallons/day, however, WCWC's contractual capacity is insufficient to comply with the IEPA regulations because it is less than WCWC's maximum average daily demand plus 20 percent. Accordingly, WCWC does not have the legal right to serve Coulterville because it is not "designed to produce" sufficient water under Illinois law.[9]

WCWC argued before the district court that it can increase its contractual capacity. In support of this argument, WCWC's CEO testified that Kaskaskia, Rend Lake, and Nashville have all told WCWC that they can provide additional water if required. But the district court rejected that argument because this testimony is inadmissible hearsay. WCWC does not renew this argument on appeal, and for good reason—inadmissible hearsay evidence does not create a factual dispute at summary judgment. *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (holding that "an unsubstantiated, hearsay assertion … is insufficient to defeat summary judgment"). Unlike utilities that have treatment facilities, WCWC requires contracts to ensure that it can obtain enough water to satisfy its customers' demand. We cannot simply take WCWC's word that it could buy more water if its demand increases—there may be reasons its current suppliers could not or would not sell more water to WCWC. To raise a factual dispute about

---

[9] This is not to say that contractual capacity alone will always be the correct metric. In some cases, the pumping capacity may be the limiting factor.

its contractual capacity, WCWC needed to provide admissible evidence showing it could buy more water.

At oral argument, WCWC argued that its contractual capacity was sufficient because it need only be able to provide service "within a reasonable time." *See Ross Cnty.*, 666 F.3d at 399 ("The association seeking § 1926(b) protection must also be capable of providing service to the disputed area within a reasonable time after a request for service occurs." (citations omitted)). According to WCWC, this means that it should have the opportunity to ask its suppliers if it can purchase more water from them and its argument only fails if its suppliers say they are unable to sell any more water to WCWC.

We have doubts about this argument. The "within a reasonable time" language comes from caselaw, not the statute, and most courts have held that this requirement applies to the "pipes in the ground" prong of the test, not the legal right prong.[10] *See, e.g., id.* at 401 (noting the "pipes in the ground" prong requires "the association seeking § 1926(b) protection [to] have 'adequate facilities within or adjacent to the area to provide service to the area *within a reasonable time after a request for service is made*'" (citation omitted)); *Chesapeake Ranch*, 401 F.3d at 279 & n.3 (same).

But even if the "within a reasonable time" requirement applies to the legal right prong, WCWC's argument fails. While it would not need to have contracts in place under which it could purchase additional water immediately, WCWC nonetheless needed to produce admissible evidence showing that

---

[10] Because WCWC does not have a legal right to provide services to Coulterville, we do not decide whether WCWC satisfies the "pipes in the ground" prong of the test.

it could secure additional contractual capacity "within a reasonable time." Discovery was the time for WCWC to produce such evidence, but it has failed to do so. Thus, WCWC has not established a factual dispute about whether it is "designed to produce" sufficient water under Illinois law—the record shows that WCWC's contractual capacity is less than its maximum average daily demand plus the required 20 percent reserve. As the district court found, "WCWC's failure to secure [admissible] evidence of its ability to expand its water supply capabilities is fatal to its claim."

### III. Conclusion

For the foregoing reasons, the district court's decision is

AFFIRMED

BRENNAN, *Circuit Judge*, dissenting. Here we face a statute, 7 U.S.C. § 1926(b), that has been interpreted rarely, and a state regulation, 35 Illinois Administrative Code § 604.105(a), which has not been previously construed except by the district court in this case.

I agree with much of the majority opinion's analysis, including that to receive protection under § 1926(b) the Washington County Water Company (WCWC) must show that it has a legal right under state law to serve the Village of Coulterville. I disagree, however, with the majority opinion's reading of § 604.105(a), and its reliance on the purpose of the Illinois Environmental Protection Act—"to assure an adequate supply of pure water for all beneficial uses," 415 ILL. COMP. STAT. 5/14. The majority opinion agrees with Sparta that the Act's purpose means the court should look at WCWC's pumping capacity as limited by its contractual capacity in assessing compliance with § 604.105(a). But to me, the plain text of that regulation controls.

It is true that "words are given meaning by their context, and context includes the purpose of the text." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012). But there are limits to considering purpose when interpreting text. *Id.* at 56–57; *see, e.g.*, *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373–74 (1986) ("Application of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action."); *NLRB v. HH3 Trucking, Inc.*, 755 F.3d 468, 471 (7th Cir. 2014) ("[S]tatutes have stopping points as well as general objectives, and how far to go in pursuit of those objectives is integral to the

legislative choice." (citing *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987))). The purpose that Sparta advances and that the majority opinion effectuates is abstract and highly generalized, and should not be used to contradict or supplement the legal text. SCALIA & GARNER, *supra*, at 57.

Section 604.105(a) provides, "The community water supply must be designed to produce at least 20 percent greater than the maximum average daily demand, as defined in 35 Ill. Adm. Code 601.105." When the regulation is broken down into its component parts:

- A "community water supply" means "a public water supply which serves or is intended to serve at least 15 service connections used by residents or regularly serves at least 25 residents." ILL. ADMIN. CODE tit. 35, § 601.105(a).

- "Public water supply," in turn, is defined as "all mains, pipes and structures through which water is obtained and distributed to the public, including wells and well structures, intakes and cribs, pumping stations, treatment plants, reservoirs, storage tanks and appurtenances, collectively or severally, actually used or intended for use for the purpose of furnishing water for drinking or general domestic use and which serve at least 15 service connections or which regularly serve at least 25 persons at least 60 days per year." *Id.*

- "Infrastructure," which has a nearly identical definition to "public water supply," means "all mains, pipes and structures through which

water is obtained and distributed to the public, including wells and well structures, intakes and cribs, pumping stations, treatment plants, reservoirs, storage tanks and appurtenances, collectively or severally, actually used or intended to be used for the purpose of furnishing water for drinking or general domestic use." *Id.*

Reading these definitions together, "community water supply" refers to a water association's infrastructure. The majority opinion agrees. Maj. Op. at 12 ("And, as the dissent notes, the definition [of] 'public water supply,' in turn, is focused on the infrastructure 'actually used or intended for use for the purpose of furnishing water for drinking or general domestic use.'" (quoting § 601.105(a))). So, under § 604.105(a), that infrastructure must be "designed to produce" a certain quantity of water.

Pumping capacity measures "how much water WCWC's pumping stations can distribute through its system." Maj. Op. at 14. Because pumping capacity quantifies how much water WCWC's infrastructure can distribute, I see it is an appropriate measure for assessing its compliance with § 604.105(a).

Contractual capacity is "the amount of water WCWC is entitled to purchase under contract from its suppliers." Maj. Op. at 16. Contractual capacity is not linked to a water association's infrastructure; rather, it depends on that association's ability to obtain water from suppliers. Therefore, to me, contractual capacity is not an appropriate measure for determining whether that infrastructure is designed to produce a certain quantity of water. Pumping capacity alone should be used to assess WCWC's compliance with § 604.105(a). As the

majority opinion describes very well, that decision ends up as dispositive in this case.

The majority opinion reads the regulation "as referring to the *water association's* ability to furnish sufficient water to residents … ." Maj. Op. at 13 (emphasis added). The question is framed as whether the water association, not its infrastructure, satisfies § 604.105(a). *See* Maj. Op. at 10 ("Accordingly, WCWC can only survive summary judgment if it can establish a genuine factual dispute as to whether *it* is 'designed to produce' at least 20 percent more than its maximum average daily demand (including Coulterville's demand), as required by IEPA regulations." (emphasis added)).

This reading is puzzling given the majority opinion's agreement that the subject of the regulation is a water association's infrastructure, not the water association itself. *Id.* at 12. Left unexplained is how contractual capacity measures whether infrastructure meets the water quantity requirements of § 604.105(a).

For the majority opinion, the consequence of my reading is that the meaning of "designed to produce" would change depending on the water association at issue. Maj. Op. at 13. The majority opinion sees "[n]othing in the language of the regulation," *id.*, supporting that reading. But the definition of "design to produce" does not change; instead, it is the type of infrastructure to which the regulation applies which may change. This interpretation is supported by the definitions of "public water supply" and "infrastructure," which inform the meaning of "community water supply" as used in the regulation. Those definitions encompass several different types of infrastructure, including pumping stations and treatment plants. § 601.105(a). That infrastructure, regardless of type,

must be designed to meet the water quantity requirements of § 604.105(a).

Based on my reading of the regulation, I would conclude that pumping capacity alone should be used to assess WCWC's compliance with § 604.105(a). There is a genuine dispute as to whether that capacity meets or exceeds its maximum average daily demand plus the 20 percent reserve, so I would reverse and remand for further consideration by the district court.